UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW BALANCE ATHLETIC SHOE, INC, ) | CA NO.: 05CV10794GAO |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| YUNTEX ENTERPRISE (HK) LIMITED ) | |
| AND HORACE CHANG, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

### PLAINTIFF'S MOTION FOR ISSUANCE OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTERS ROGATORY)

Plaintiff, New Balance Athletic Shoe, Inc. ("New Balance"), respectfully moves the Court to request international judicial assistance[1] in order to effectuate service of process upon the defendant, Horace Chang ("Chang") in Taiwan. In support of this motion, New Balance states the following:

### I. PRELIMINARY STATEMENT

1.     On or about December 22, 2004, New Balance obtained an arbitration award (the "Award") in its favor against Chang and Yuntex Enterprise (HK) Limited ("Yuntex" and, together with Chang, the "Foreign Defendants") stemming from a commercial dispute. A copy of the Award is appended as Exhibit "A".

2.     After the Foreign Defendants failed to pay or otherwise satisfy the Award, on or about April 21, 2005, New Balance filed a civil lawsuit in this Court seeking to enforce the Award and to obtain a judgment consistent with the Award.

---

[1]     Requests for international judicial assistance are often referred to as "letters rogatory."

3.    Defendant Chang is a resident of Taiwan.

4.    New Balance has thus far been unable to obtain Chang's formal waiver or service or to perfect service of the Complaint and summons upon the defendant Chang.

## II. **RELIEF REQUESTED**

5.    New Balance requests that the Court seek international judicial assistance from the appropriate Taiwanese authorities in order to effectuate personal service of process upon Defendant Chang in Taiwan, pursuant to the requisites of the law of Taiwan.

6.    New Balance asks that the request for international judicial assistance be in the format of the document attached to this motion as Exhibit "B" and that the Court both sign and affix its official seal thereto.

7.    New Balance will reimburse the Court, the Clerk of the Court, or the Taiwanese authorities, as appropriate, for any costs or expenses associated with the request for international judicial assistance and the service of process in Taiwan upon Defendant Chang.

8.    This Motion is brought in good faith and with just cause. As the plaintiff in this action seeking recovery of substantial sums of money, New Balance has a compelling interest in perfecting service of process upon – and prosecuting fully litigation against – the Foreign Defendants.

9.    The granting of this Motion is consistent with the best interests of justice and will

2

result in no undue prejudice to either the Court or any party to this action.

Respectfully submitted,
GREENBERG TRAURIG
Attorneys for Plaintiff
One International Place, 20th FL
Boston, MA 02110
Telephone: (617) 310-6000

By:
JAMES P. PONSETTO (BBO # 556144)

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1

I hereby certify that on June 15, 2005, I attempted in good faith to confer with the Foreign Defendant in an attempt to resolve or narrow the issues raised in this motion, but was unsuccessful in communicating with the foreign defendants.

James P. Ponsetto

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by U.S. mail this 16th day of June, 2005 upon:

Mr. Horace Chang
No. 262-2 Lien Tsun Road
Feng Yuan, Taichung
Taiwan   R.O.C. 420

3

Yuntex Enterprise (HK) Limited
Chevalier Commercial Center
Room 1219
No. 8 Wang Hoi Road
Kowloon Bay
Kowloon
Hong Kong
Attn: President

JAMES P. PONSETTO

bos-srv01\165366v01

4

# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
## International Arbitration Tribunal

In the Matter of the Arbitration between:

Re: 50 133 T 00057 03
    New Balance Athletic Shoe, Inc.
    vs
    Yuntex Enterprise (HK) Limited
    and
    Horace Chang

## FINAL AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreements dated January 1, 1995, by which the above-named parties are bound, having been duly sworn, based upon the findings of fact, rulings of law, and conclusions set forth in my Second Partial Award, which are incorporated and made part of this Final Award by reference, and having considered the parties' subsequent submissions on the allocation of the costs of the arbitration, do hereby, AWARD, as follows:

1. The Respondents are ordered to cease making any use of, and to return to the Claimant, forthwith, any and all items of the Claimant's property in their possession, including, without limitation, New Balance signs, labels, packages, wrappers, advertisements, footwear molds and technical, sales, marketing and other confidential business materials relating to formulae, specifications, manufacturing processes, standards, and technical information.

2. The respondents shall, jointly or severally, pay the Claimant damages in the amount of SIX MILLION NINE HUNDRED TWENTY FOUR THOUSAND AND FIVE HUNDRED ($6,924,500.00) DOLLARS and interest in the amount of TWO MILLION NINE HUNDRED FIFTY FIVE THOUSAND ONE HUNDRED TWENTY-FOUR DOLLARS AND EIGHTY CENTS ($2,955,124.80), all in US currency.

3. The compensation and expenses of the arbitrator totaling FOURTY THOUSAND SIX HUNDRED THIRTY SEVEN DOLLARS AND ELEVEN CENTS ($40,637.11) shall be borne in the following proportions: 20/% by Claimant and 80% jointly and severally by Respondents. Therefore, Respondents shall pay to Claimant, jointly or severally, the sum of TWENTY THOUSAND SEVEN HUNDRED TWELVE DOLLARS AND FOURTY TWO CENTS $20,712.42 for that portion of compensation previously advanced to the International Centre for Dispute Resolution ("ICDR") AND Respondents shall pay to the ICDR, jointly or severally, the sum of ELEVEN THOUSAND SEVEN HUNDRED NINETY SEVEN DOLLARS AND TWENTY SEVEN CENTS $11,797.27 for compensation still due the arbitrator.

4. The administrative fees and expenses of the ICDR totaling $11,075.00 shall be borne in the following proportions: 20/% by Claimant and 80% jointly and severally by Respondents. Therefore, Respondents shall pay to Claimant, jointly or severally, the sum of EIGHT THOUSAND EIGHT HUNDRED SIXTY DOLLARS $8,860.00 for that portion of its share administrative fees and expenses previously advanced by Claimant to the ICDR.

This Final Award is in full settlement of all claims/ and counterclaims submitted to this Arbitration. The arbitrator will retain jurisdiction until January 22, 2005, to clarify this Final Award, if necessary.

I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Boston, Massachusetts, USA.

December 22, 2004                                    Natasha Lisman
        Date

State of Massachusetts      }
                            }  SS:
County of Suffolk           }

I, Natasha C. Lisman, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

December 22, 2004                                    Natasha Lisman
        Date

#357513

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

In the Matter of the Arbitration Between:             50 T 133 00057 03

New Balance Athletic Shoe, Inc.
vs.
Yuntex Enterprise (HK) Limited,
and Horace Chang

## SECOND PARTIAL AWARD
### And
### PROCEDURAL ORDER

## PROCEDURAL HISTORY

Based on the evidentiary hearing and the pre-hearing and post-hearing

submissions of the Claimant, New Balance Athletic Shoe, Inc. ("New Balance"), and the

Respondents, Yuntex Enterprise (HK) Limited ("Yuntex") and Horace Chang, I have

made my findings and conclusions as to the previously unresolved jurisdictional issue

and as to liability and remedies. This award is partial because, at the Claimant's request,

the issue of the allocation of arbitration costs has been put off until after the disposition of

liability and remedies.[1]

Both Yuntex and Mr. Chang raised jurisdictional objections from the outset and

throughout this proceeding, predicating them on the fact that neither was a signatory to

the two arbitration agreements upon which New Balance based its demand for this

arbitration. In my First Partial Award I ruled that Yuntex was bound by the arbitration

agreements because it was an alter ego of the signatory, Haikou Johaco Enterprise Ltd.

---

[1]     The Claimant also requested additional time to submit evidence of its attorney's fees. In view of
my conclusion on this issue, such submission will not be necessary.

("Haikou"), [2] and had expressly assumed Haikou's rights and obligations under the contracts containing the arbitration agreements. As to Mr. Chang, I ruled that while the evidence before me at the preliminary stage of the arbitration was insufficient to allow a conclusive finding, because much of the evidence bearing on his relationship to Haikou was likely to be in the Respondents' possession and control, I would reserve a decision on arbitral jurisdiction over Mr. Chang until after the completion of discovery.

In my Third Procedural Order I allowed New Balance to propound to the Respondents a specified number of interrogatories, document requests, and requests for admission of facts.[3] The Order expressly cautioned Respondents that failure to respond "to any request for admission of facts by either (i) admitting or denying its truth, or (ii) objecting to it, shall be deemed to be an admission," and that failure to respond to "any interrogatory or request for documents may be treated as a basis for adverse inferences."

The Third Procedural Order and New Balance's subsequent discovery requests were duly served on Respondents. However, neither of them ever responded or sought any relief from the Third Procedural Order. As the matter approached the final hearing, the Respondents requested postponement of the previously scheduled hearing date and an extension of time for their pre-hearing submission of documentary exhibits and briefs. In the exercise of discretion and abundance of fairness, I granted their request, thereby extending to them yet another opportunity to offer substantive evidence in support of their positions on jurisdiction and to mount a defense on the merits. In spite of having requested and obtained the extension, Respondents made no pre-hearing submission. New Balance submitted an extensive set of documentary exhibits and a brief.

---

[2]     This company's name is sometimes transliterated as "Haiku."

[3]     Neither Yuntex nor Mr. Chang requested any discovery.

2

At the hearing, both sides were represented by counsel, one firm representing New Balance and another appearing jointly on behalf Yuntex and Mr. Chang. New Balance offered additional exhibits and the testimony of two executives. Yuntex's and Mr. Chang's attorney cross-examined New Balance's witnesses, put in several documentary exhibits but called no witnesses. Both sides submitted post-hearing arguments of fact and law.

In making my findings of fact, I relied on the evidence in the record and reasonable inferences from the evidence. In addition, in accordance with my Third Procedural Order, I treated the Respondents' failure to respond to certain requests for admissions of fact as constructive admissions and drew adverse inferences from their failure to respond to certain interrogatories and document requests. At the same time, I sought to avoid treating the Respondents' failure to respond to discovery in a manner that would be tantamount to the imposition of discovery sanctions or a default award, because the rules prescribed by the arbitration agreements, the Commercial Arbitration Rules of the American Arbitration Association,[4] do not authorize discovery sanctions and, in Rule 31, expressly prohibit default awards.

Accordingly, I limited the effect of a failure to respond as a constructive admission or a basis for an adverse inference only to such requests to admit, interrogatories and document requests that were couched with sufficient specificity as to permit a fact finder to derive from failure to respond the existence of specific facts or the evidence and import of specific documents. Furthermore, I considered inferences and constructive admissions arising from the Respondents' failure to respond only in

---

[4]    I applied the AAA Commercial Arbitration Rules as amended and effective on July 1, 2002, i.e. in effect at the time New Balance made its demand for arbitration.

conjunction with, or to fill gaps in, actual evidence but did not take them into consideration if they were inconsistent with actual evidence in the record.

## FACTS

### 1.    The parties and their business relationship

New Balance, a Massachusetts corporation, is one of the world's leading makers of athletic footwear, which is sold in over 120 countries. New Balance owns and has registered in the United States and numerous other countries, including China, a number of trademarks, including the so-called "N Saddle Design," which is a stylized, capital block-letter "N" affixed to the saddle and other parts of a shoe. New Balance produces and sells its shoes through various arrangements, including contracts with manufacturers and distributors to whom it grants licenses to use its trademarks in manufacturing New Balance shoes and/or distributing them in designated territories.

Horace Chang[5] is a Taiwanese businessman who has been involved in manufacturing and trade, including the production and distribution of footwear, in Taiwan, Hong Kong, and the People's Republic of China ("China" or "PRC"). He has conducted his business activities through several entities, including Yuntex,[6] located in Hong Kong; Chen Feng Footwear Co., LTD ("Chen Feng"), located in Taiwan; and Union Sports Industrial (Yang Jiang) Co., LTD ("USI"), located in China. He is a graduate of Taipei Technical Institute, lived in Canada for many years, and, at the time of the events at issue, was in his late fifties. The correspondence between him and others in the record demonstrates that his command of the English language is sufficient to enable him to correctly understand and make himself understood in English.

---

[5]    Horace Chang's Chinese name is also transcribed as Zhang Guoyang.

[6]    Until late 1997, Yuntex was called Johaco Enterprise (H.K.) LTD.

As of 1994, New Balance had been having shoes manufactured in China for export to the United States and elsewhere, but had not yet begun selling shoes in China. In late 1994, Mr. Chang approached New Balance with a proposal to sell its shoes in China through Haikou, representing that it was an entity he had formed to conduct distribution in China under a license granted by the Chinese government. New Balance was already familiar with Mr. Chang, having successfully dealt with him for many years in connection with contracts under which Chen Feng and USI factories had made New Balance shoes for export. New Balance accepted Mr. Chang's proposal and, on January 1, 1995, New Balance and Haiku executed a License Agreement granting Haiku a non-exclusive license to use New Balance's technical information and trademarks to arrange for the manufacturing and distribution of New Balance footwear, and a Distribution Agreement appointing Haiku as New Balance's exclusive distributor in the territory of China.

Thereafter, USI proceeded to produce New Balance shoes both for export and for China's domestic market, where Haiku distributed them on the wholesale basis and through its own retail outfits. In 1998, at Mr. Chang's request, New Balance's designation of Haiku as its China distributor was transferred to Yuntex. By 1999, Yuntex controlled approximately 85% of all retail outfits in China where New Balance shoes were sold.

Throughout his dealings with New Balance executives, Mr. Chang conducted himself, and held himself out, as the sole owner of Yuntex, Chen Feng, and USI. He referred to a USI factory as "my factory" and " to Haiku as "my company" and never mentioned or brought into discussions any partners or other co-principals. While the

5

New Balance executives encountered other individuals working at the three companies and later at Haikou, in these individuals' interactions with Mr. Chang, they behaved, and he treated them, as his subordinates.

In addition, Mr. Chang treated Yuntex, Chen Feng, USI, and Haiku as parts of a unified business enterprise. He intermingled the companies in his periodic presentations of status reports and business plans to New Balance. He also used the companies' trademarks, physical facilities, personnel, letterhead and electronic communication facilities interchangeably and without regard to whether a particular matter or function formally related to one or another company. Thus, shoes made by USI bore a "CF" mark, which stood for Chen Feng; the License and Distribution Agreements between New Balance and Haikou provided that notices to Haikou be mailed to Yuntex[7] in Hong Kong; Mr. Chang's faxes and emails concerning distribution issues in China, formally Haikou's role, arrived at random from Chen Feng, Yuntex, and USI; as previously noted, in 1998, he instructed that New Balance re-issue the certificate of "sole authorized representative and agent of New Balance" in the name of "YUNTEX ENTERPRISE (H.K.) LTD instead of Haikou Johaco Enterprise Ltd."; and in 1999, a warehouse for use in Yuntex's distribution business was built on the premises of a USI factory.

Based on this evidence, and combining it with the constructive admissions and negative inferences arising from the Respondents' failure to respond to New Balance's specific discovery requests concerning the relationship between Mr. Chang and the companies and the relationship among them, I reiterate my prior finding that Yuntex was at all times an alter ego of Haikou and, from 1998 on, the successor to Haikou's rights and obligations under the License and Distribution Agreements. I further find that Mr.

---

[7]    Then still named Johaco.

Chang was an alter ego of Yuntex. The documents offered on behalf of Yuntex and Mr. Chang by their counsel, which I accept as genuine even though they were not authenticated by any witness, show only the formal status of Yuntex and Haikou as separate legal entities but do not address, much less refute, the evidence that for all practical purposes, Mr. Chang used these entities as parts of a single manufacturing and trading operation under his exclusive control.

### 2. The termination of the parties' relationship

In 1999, difficulties emerged between New Balance and Mr. Chang that ultimately lead to a breakdown of their relationship. The difficulties began with New Balance's discovery at two USI factories of ongoing production of a very large volume of the so-called "classic" models of New Balance footwear, which were older models appropriate for marketing as lower-end, casual fashion footwear, in contrast to New Balance's newer, high-end and high performance athletic lines. This discovery caused New Balance several concerns, the most relevant of which for present purposes were that the volume of the production, which Mr. Chang reported was 450,000 pairs, was a dramatic increase from the actual volume of sales achieved in China in prior years and New Balance feared that it would vastly exceed the demand in that market, while, at the same time, the "classic" models under production were appropriate only for China's emerging market but not for New Balance's other markets, where it did not want to dilute its athletic performance brand image.

These concerns grew when New Balance began to receive reports that "classic" shoes bearing both New Balance's trademarks and USI's "CF" mark were appearing in Japan and other countries. New Balance's first reaction was to see to it that a label be

7

affixed to each pair of USI-made "classic" shoes stating that they were for sale in China only. However, when even shoes bearing this label were spotted in markets outside of China, New Balance became concerned that there were leaks in Mr. Chang's distribution chain through which product intended only for China was being trans-shipped into other markets - a phenomenon known as "parallel import" (i.e. parallel to the authorized import).

New Balance asked Mr. Chang for help in identifying and stopping the points of leakage. However, he failed to provide New Balance information about his customers, dealers, and orders needed for that purpose and outright refused to work with New Balance to solve the parallel import problem.[8] In response, New Balance informed Mr. Chang that it would terminate the License and Distribution Agreements effective December 31, 1999 and formally confirmed the termination by written notice in August, 1999. While ending the parties' China distribution relationship, New Balance continued to use USI as a supplier of New Balance shoes for export. However, as a result of further developments described below, New Balance decided to cease all dealings with Mr. Chang and his companies and gradually let outstanding orders for USI production run out by late fall, 2000.

### 3.   Post-termination events

Following the termination of the License and Distribution Agreements, Yuntex retained possession of various New Balance assets it had been provided in connection with the agreements, including New Balance signs, labels, packages, wrappers and

---

[8]      In a letter to New Balance, Mr. Chang declared that he had "no time to care about parallel import from China," and concluded, "I own my own company ... and you have no power to order me to do so and so."

advertisements, which Yuntex continued to display in its retail stores, as well as footwear molds and technical, sales, marketing and other confidential business materials relating to formulae, specifications, manufacturing processes, standards, and technical information.

In addition, in the course of the year 2000, New Balance acquired information that led it to conclude, and allege in this arbitration, that Mr. Chang and his companies have engaged in two activities which New Balance deems wrongful:

(1)    Selling China-only "classic" models of New Balance shoes past April 30, 2000, which was the latest cut-off date by which Yuntex was contractually allowed to sell off any remaining inventory intended for the China market, as well as continuing to make such shoes and use New Balance trademarks, and

(2)    Manufacturing and selling in China and other markets "Henkee" brand shoes,  which were indistinguishable from the New Balance "classic" fashion models and displayed a saddle design featuring a stylized capital "H" bearing some resemblance to a reverse capital "N." It is for these activities, and the profits they allegedly yielded to the Respondents, that New Balance seeks to recover in this arbitration.

### a.    Post-termination production and sale of New Balance shoes

The evidence requires different findings concerning New Balance's allegations of post-termination production and post-termination sale of New Balance shoes.  The evidence upon which New Balance relies is insufficient to support a finding that Mr. Chang and any of his companies continued to make new "classic," China-only models with New Balance trademarks after the termination of the License and Distribution Agreements.  While investigators retained on behalf of New Balance reported finding New Balance shoes in production at a USI factory in 2000, they did not identify the shoe

9

models and their investigation was conducted at a time when the particular factory was

still authorized to produce New Balance footwear for export. Furthermore, while another

investigation report did refer to 20,000 pairs as being "for the domestic market," those

were in storage and could well have been part of the 1999 overstock rather than newly

made product. Finally, none of New Balance's discovery requests help resolve the

doubts left by the evidence as to continuing post-termination production because on that

issue, the requests are not specific enough.

By contrast, on the issue of post-termination sale of New Balance shoes, the

evidence in support of New Balance's claim is clear and persuasive. In 2001, long after

the permissible post-termination sell-off period had ended, New Balance investigators

posing as buyers elicited offers of sale of New Balance shoes on two separate occasions.

On the first occasion, personnel at a USI facility, with Mr. Chang's knowledge and

permission, offered to sell the investigator 125,740 pairs of New Balance shoes; on the

other occasion, employees at a facility bearing both Yuntex and USI signs accepted the

investigator's order for 6,492 pairs of New Balance shoes.[9]

### b.    Manufacture and distribution of Henkee shoes

That Yuntex manufactured and distributed Henkee shoes in China in 2000 was

admitted by Mr. Chang in a contemporaneous e-mail to New Balance and by Yuntex in

its marketing materials. While the onset and duration of this activity are not established

with precision, circumstantial evidence indicates that Yuntex's manufacture, distribution,

and sale of Henkee shoes were ongoing by January 1, 2000 and continued well beyond

---

[9]    The investigator also reported receiving a representation that more New Balance shoes could be
manufactured but I have disregarded this representation because it was made by a broker, not by a USI
employee.

the end of that year. An application to register the Henkee mark had been made in 1999 and New Balance obtained photographs of a store carrying Henkee shoes, along with New Balance shoes, in early 2000. Mr. Chang's email was sent in April 2000 and New Balance investigators found Henkee shoes available for sale at a USI facility in November 2001.

New Balance contends that the Henkee stylized "H" saddle design is confusingly similar to New Balance's "N" saddle design. New Balance's evidence did not include any market survey or focus group study showing actual consumer confusion. Based on my own comparison of photographs and actual samples of New Balance and Henkee shoes introduced by New Balance, I do not find the two saddle designs confusingly similar, particularly when viewed in the context of the entire shoe. Henkee shoes prominently displayed the full word "Henkee" in several places and each pair was sold with a hang tag clearly explaining that Yuntex had introduced the Henkee brand in order to fill a gap created by New Balance's decision to use its trade mark only on high tech sports shoes. The hang-tags puffed about Yuntex's experience as New Balance's authorized agent and claimed that Henkee shoes were of the same quality as New Balance shoes, but did not claim New Balance as their source of origin.

c.   **Profits**

Having been frustrated in its efforts to obtain through discovery actual information and documents upon which to calculate the Respondents' profits, New Balance opted to estimate the profits with the help of an economic model. The model was developed and presented at the hearing by New Balance's Corporate Manager of Sourcing, Purchasing, and Logistics, Jim Sciabarrasi, testifying as an expert. I find Mr.

11

Sciabarrasi qualified to provide such expert testimony by virtue of his extensive experience in the industry and personal knowledge of prevailing prices, costs, and profit margins at different levels of product distribution. Further, I find him a very credible witness and his model a reasonable approach in view of the unavailability of the actual data. Since the unavailability is solely of Yuntex's and Mr. Chang's making, it is reasonable and fair to resolve against them any uncertainty inherent in the use of estimates instead of actual numbers.

Therefore, I accept Mr. Sciabarrasi estimate that, on the per unit (i.e. pair of shoes) basis, the profits realized from manufacturing, wholesale distribution, and retail sales for both New Balance and Henkee shoes added up to $12.59 per pair. However, I do not accept the total volume of shoes he estimated to calculate total profits. He did not and could not have derived the volume from his personal knowledge or industry data. New Balance's requests to admit do not address the volume of sales and thus do not give rise to any specific constructive admission on the subject. Likewise, its interrogatories and document requests were not couched in terms permitting any specific inference as to volumes of shoes to be drawn from Respondents' failure to respond to them. Thus, the volume of shoes Mr. Sciabarrasi plugged into his model was essentially an assumption and I find it both too speculative and in tension with what little relevant evidence is available.

Since the evidence of Respondents' continuing to manufacture China-only New Balance models after 1999 and any models after 2000 is insufficient, the only fair inference is that the New Balance shoes they sold after the termination of the License and Distribution Agreement were part of the overstock produced in 1999. By Mr. Chang's

12

documented admission, the total volume of that production was 450,000 pairs, of which 250,000 pairs was intended to be held at a Yuntex warehouse at a USI facility for the following year – the very same facility at which New Balance investigators were later offered New Balance shoes. Based on Yuntex' pre-termination actual sales record and sale projections, it is fair to estimate that it sold at most 50,000 pairs before the April 30, 2000 cut-off date, and the remaining 200,000 over some period thereafter.

With respect to the volume of Henkee shoes made in 2000, it is fair to hold Yuntex and Mr. Chang to his own mid-1999 production forecast for the year 2000 for New Balance's "classic" models – 350,000 pairs – and to infer that this was the volume that Yuntex replaced with the Henkee brand after New Balance's termination of Yuntex's License and Distribution Agreements. For the reasons explained in my Conclusions, I find it unnecessary to determine whether Yuntex produced any Henkee shoes after 2000, or when the 350,000 pairs made in 2000 were sold.

Thus, while accepting Mr. Sciabarrasi's model and data on the per pair of shoes basis, to arrive at total profits, I multiplied his per-pair estimate of $12.59 by 550,000 pairs (200,000 pairs of New Balance shoes and 350,000 pairs of Henkee shoes), yielding the sum of $6,924,500.00.

## CONCLUSIONS

### I.    Jurisdiction

In an arbitration arising out of a transaction in international commerce, jurisdictional issues are resolved in accordance with international law, the New York Convention For the Recognition and Enforcement of Foreign Arbitral Awards. *Intergen N.V. v. Grina*, 344 F.3d 134, 149 (1st. Cir. 2003). International law recognizes that a

13

non-signatory to an arbitration agreement who, or which, is an alter ego of a signatory, can be bound by it and required to submit to an arbitration demand by the other signatory. *Id.*; *See generally*, Lamm and Aqua, *Defining the Party – Who Is A Proper Party In An International Arbitration Before the American Arbitration Association and Other International Institutions*, 34 Geo. Wash. Int'l L. Rev. 711 (2003). The same principle would hold if jurisdiction were governed by Massachusetts law. *See, e.g., Ross v. Health and Retirement Properties Trust*, 46 Mass.App.Ct. 82, 703 N.E.2d 734 (Mass.App.Ct., 1998); *Keystone Shipping Co. v. New England Power Co.*, 1995 WL 1146893 (Mass.Super., 1995). Applying this principle to the facts of this case, I conclude that both Yuntex and Mr. Chang are bound by the arbitration clauses contained in the License and Distribution Agreements.

## II.    Merits

### 1.    Arbitrable claims and governing law

Although New Balance asserted a number of causes of action in its original demand for arbitration, by the time of the hearing it had boiled its claims down to two: breach of contract and trademark counterfeiting and infringement. While the trademark claims are arbitrable to the extent they overlap with breach of contract claims, as separate and independent claims they are beyond the scope of the parties' two arbitration agreements.

The agreements encompass "any and all disputes related to or stemming from" the License and Distribution Agreements. Although these arbitration agreements are broad, they do not include New Balance's claims based on the US and Massachusetts trademark protection laws that are not dependent on the existence of any agreement between the

14

parties. In other words, if the Respondents committed the alleged counterfeiting and infringement acts, they would be liable under those laws regardless of whether they ever had a contract with the Claimant. Therefore, the trademark law-based claims are not "disputes related to or stemming from" the License or Distribution Agreements.

Furthermore, I do not agree with New Balance's assumption that the US and Massachusetts trademark protection laws apply here. The License and Distribution Agreements each contains a choice of law clause providing that the "Agreement shall be deemed to have been entered into in the Commonwealth of Massachusetts, USA and shall be governed by and construed in accordance with the laws of the Commonwealth." This language cannot be read as showing that it was within the shared contemplation of the parties that the business activities they had agreed to conduct in China would be subject not only to Massachusetts contract law but also to the full panoply of federal and state laws that apply to parties doing business in Massachusetts. Therefore, in determining the merits of New Balance's claims, I have applied only Massachusetts contract law.

### 2.    Liability

As an initial matter, under Massachusetts law governing the liability of a non-party to a contract for breach of contractual obligations, I conclude that the relationship between Yuntex and Haikou, and between Mr. Chang and both companies, was such as to render both Yuntex and Mr. Chang liable for any breach of the License and Distribution Agreements. My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 (1968) (piercing the veil between closely identified corporations); Pepsi-Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc., 754 F.2d 10, 15-15 (1st. Cir.

1985)(applying Massachusetts law to pierce the veil between individual shareholders and corporations).

I conclude that Yuntex's retention and use of New Balance property after the termination of the License and Distribution Agreements constitute a continuing violation of §§10(c) and (e) of the License Agreement and §§IV.4(a) and XIV.3 of the Distribution Agreement, which require that following termination, all production, advertising, financial, technical, and marketing materials must immediately be returned to New Balance.

I further conclude that Yuntex's and Mr. Chung's sale after April 30, 2000 of 200,000 pairs of shoes made in 1999 for New Balance and bearing its trademarks constituted a violation of §§ 10(c) and (e) of the License Agreement and §XIV.3 of the Distribution Agreement, which in clear and unambiguous terms obligated Yuntex and Mr. Chang to refrain from making any use of New Balance trademarks upon termination. However, because I do not find the Henkee trademark confusingly similar to New Balance's, the manufacture and sale of Henkee shoes did not violate the anti-infringement provisions of § 5(c) of the License Agreement.

On the other hand, the manufacture and distribution of Henkee shoes in 2000 did violate the non-competition clauses in both Agreements, § 5(g)(i) and § VII, respectively, pursuant to whose clear terms Yuntex and Mr. Chang were to refrain for one year following termination from manufacturing, distributing, selling, or otherwise handling in China any products similar to New Balances' products or which can be put to identical or similar uses. Under Massachusetts law, these non-competition agreements are reasonable

16

in geographic scope and duration and, therefore, enforceable. *See, e.g., Boulanger v. Dunkin Donuts Inc.*, 442 Mass. 635 (2004).

### 3.    **Remedies**

Massachusetts law permits both specific performance and damages to be granted as remedies in a contract action. *See, e.g., Lima v. Lima*, 30 Mass. App. Ct. 479 (1991); *Singarella v. Boston*, 342 Mass. 385 (1961). In this case, I conclude that specific performance is warranted with respect to the Respondents' retention and use of New Balance property and the final award will include an order to that effect.

With respect to damages, although ordinarily the purpose of damages for breach of contract is to compensate the plaintiff for any loss sustained as a proximate result of the defendant's breach, Massachusetts contract law does recognize that under some circumstances, such as breach of an agreement to cease using a license to intellectual property, the appropriate remedy is to award the plaintiff the profits of the wrongdoer. *Eno v. Prime Mfg. Co.*, 314 Mass. 686 (1943). *See also*, Restatement (Second) on Contracts; § 371(b); Dobbs, Handbook on the Law of Remedies, § 12.1, p.791-792 (1973). I conclude that this essentially restitutionary measure of damages is clearly warranted here. Therefore, the final award will award New Balance damages against Yuntex and Mr. Chang, jointly and severally, in the principal sum of $ 6,924,500.00.

In addition, the final award will include prejudgment interest in accordance with a Massachusetts statute governing contract actions, M.G.L. Ch. 231, § 6C, which provides for simple interest at 12% per year from the date of the breach. Because the Respondents' improper withholding of discovery has made precise determination of the dates of their breaches, and the flow of profits therefrom, impossible, I estimate the date

17

of the breach with respect to New Balance shoes to be December 31, 2001 and with respect to Henkee shoes to be December 31, 2000, and will calculate interest accordingly.

New Balance has taken the position that it is also entitled to attorney's fees and costs. With respect to attorney's fees, New Balance appears to rely solely on U.S. trademark law, perhaps out of recognition that Massachusetts law allows fee shifting from the winner to the loser only pursuant to specific statutory authorization and there is no such authorization for ordinary contract actions. *Office One, Inc. v. Lopez*, 473 Mass. 113 (2002). Since I have ruled that US trademark law is inapplicable here, I conclude that New Balance may not recover its attorney's fees.

This leaves the matter of arbitration costs and how they should be allocated, which shall be decided in the final award, after the parties have had an opportunity to present their positions.

### Procedural Order

The parties shall submit briefs stating their positions on the allocation of arbitration costs by November 22, 2004.

Arbitrator

Natasha C. Lisman

DATED:  November 10, 2004

#356116

18

**William Chang**

From:    Natasha C. Lisman [lisman@srbc.com]
Sent:    Friday, September 12, 2003 2:35 PM
To:      William Chang
Subject: Case No. 50 T 133 00057 03

Amended version

# IN THE MATTER BEFORE
## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
## OF THE AMERICAN ARBITRATION ASSOCIATION

**NEW BALANCE ATHLETIC SHOE, INC.,**            **Case No. 50 T 133 00057 03**
**Claimant**

**vs.**

**YUNTEX ENTERPRISE (HK) LIMITED,**
**a Hong Kong entity; and HORACE CHANG,**
**an individual,**
**Respondents**

## FIRST PARTIAL AWARD

### and

## SECOND PROCEDURAL ORDER

### Introduction

In accordance with my Procedural Order of July 31, 2003, both parties have submitted statements setting forth their positions regarding the Respondents' jurisdictional objection to this proceeding on the ground that they are not signatories to the two agreements upon which the Claimant predicates its claims and demand for arbitration, the Distribution Agreement and the License Agreement ("the Agreements").

The Claimant, New Balance Athletic Shoe, Inc. ("New Balance") has submitted a brief, a supporting affidavit of its Vice President for International Sales, Edward John Haddad, Exhibits A through T thereto, and copies of legal authorities. The Respondents, Yuntex Enterprise (HK) Limited ("Yuntex") and Horace Chang ("Mr. Chang"), submitted, in electronic form, a letter over the

**NB3**

printed name of Wang Rong, Attorney-at-Law with Shenda Partners, but bearing no signature or letterhead.[1]  This letter was not accompanied by any supporting evidence or legal authorities.

For the reasons set forth below, applying the governing principles to the evidence in the record and reasonable inferences therefrom, I conclude that Yuntex is bound by the arbitration clauses of the Agreements and reject its jurisdictional objection.  As to Mr. Chang, however, I reserve decision until the completion of discovery.

### Governing Principles

Like other aspects of arbitral disputes, the existence of arbitral jurisdiction over non-signatories to an arbitration agreement must be decided in "accord with the national law giving rise to the claim." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985). Here, each of the Agreements provides that it is to be deemed to have been made in, and is to be governed by and construed in accordance with, the laws of the Commonwealth of Massachusetts, U.S.A. With respect to cross-border transactions such as those here, the laws of Massachusetts, of course, include the Federal Arbitration Act, which in turn subsumes the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

Yuntex and Mr. Chang assert that their separate legal identities from the signatory to the Agreements, Haikou Johaco Enterprise Ltd. ("Haiku"), in and of itself precludes arbitral jurisdiction over them.  This assertion overlooks the well established principle in the above-mentioned bodies of law that under certain circumstances, a non-signatory to a contract may properly be designated a party to an arbitration under the contract's arbitration clause.  Recognized theories for binding a non-signatory to an agreement and its arbitration provisions include the piercing of the corporate veil and alter ego; succession to the interests of the signatory; assumption of the signatory's rights and obligations; and estoppel.  See generally, Lamm and Aqua, *Defining the Party – Who Is A Proper Party In An International Arbitration Before the American Arbitration Association and Other International Institutions*, 34 Geo. Wash. Int'l L. Rev. 711 (2003).  As to Massachusetts laws, see, e.g., *Ross v. Health and Retirement Properties Trust*, 46 Mass.App.Ct. 82, 703 N.E.2d 734 (Mass.App.Ct., 1998); *Keystone Shipping Co. v. New England Power Co.*, 1995 WL 1146893 (Mass.Super., 1995).

## The Facts

In making my factual findings, I considered only those averments in Mr. Haddad's Affidavit that identify and authenticate the documents attached as Exhibits thereto, or report actual events or statements of the corporate Respondent's executives or employees and/or of the individual Respondent. I disregarded the many subjective observations, conclusory characterizations and argumentative assertions included in Mr. Haddad's Affidavit, which do not constitute facts and are largely duplicative of the arguments that are, more appropriately, set forth in Claimant's legal brief.

My primary reliance on the documentary evidence obviates the concern expressed in Wang Rong's letter about Mr. Haddad's bias as an executive employee of New Balance.[2] I did, however, attach significance to the fact that the Respondents had the opportunity, but failed, to proffer evidence casting doubt on the authenticity or reliability of any of the Exhibits submitted by New Balance. I infer from this omission that the Respondents concede the authenticity and accuracy of these documents.

Based on these documents and other objective evidence, I find as follows:

1.      Yuntex is merely the new name that Johaco adopted as of October 31, 1997. Therefore, Yuntex is simply the continuation of the same entity under a new name and I shall refer to this entity as "Johaco/Yuntex."

2.      Haiku was, at all material times, a separate entity in name and form only, but for all practical purposes was nothing more than a branch office of Johaco and, after the above-mentioned name change, a branch office of Yuntex.

3.      To the extent that Haiku retained any legal identity after October 31, 1997, Yuntex, on its own initiative and with the assent of New Balance, assumed all of Haiku's rights and obligations under the Agreements and held itself out in the China market as New Balance's certified "China Authorized Sole Agent."

4.      There is significant evidence indicating that Horace Chang has at all material times been the control person of Johaco/Yuntex and has regarded and treated it as his sole proprietorship. However, I do not find the evidence sufficient to support a definitive finding on the relationship between Mr. Chang and Johaco/Yuntex at this time.

### Conclusions

Applying the above-discussed governing principles to the facts, I conclude that Johaco was at all material times an alter ego of Haiku. Under its new name, Yuntex, at the practical level, it continued to be Haiku's alter ego and at the formal level, it assumed and succeeded to the interests and obligations of Haiku under the Agreements.

However, under the exacting Massachusetts standard for piercing the corporate veil in order to impose serious legal consequences on individual shareholders, officers, and directors, the evidence is insufficient to permit a finding as to whether or not Johaco/Yuntex is an alter ego of Mr. Chang. For example, it is not entirely clear what company Mr. Chang characterized in Exhibit T as his "own company" and in what form he invested personal capital in the development of a market for New Balance shoes in China.[3] In addition, there is no evidence as to who has held equity in Johaco/Yuntex, its observance of corporate formalities under the applicable legal requirements, and its internal decision-making, financial, and accounting systems and practices.

I recognize that such evidence is largely in the Respondents' control and, therefore, reserve the decision on jurisdiction as to Mr. Chang until the completion of discovery.[4]

### FIRST PARTIAL AWARD

Yuntex's jurisdictional objection is hereby rejected. Action on Mr. Chang's jurisdictional objection is reserved until the conclusion of discovery.

### SECOND PROCEDURAL ORDER

The parties are hereby ordered to contact the ICDR Case Manager, Mr. William Chang, on or before September 22, 2003 and provide him with three possible dates during the first two weeks of October, 2003 for a new Preliminary Hearing to consider the previously tabled scheduling and preliminary matters, including, without limitation, the scheduling of discovery. In the meantime, however, the parties are free to serve document requests on each other.


Arbitrator,

SEP. 12. 2003  5:10PM  BEFORE                                    NO. 0866    P. 7/7   Page 5 of 5

Natasha C. Lisman, F.C.I. Arb.

September 12, 2003

#337413

[1]   This letter was transmitted as an attachment to an e-mail from johnnywu@ywntex.com.hk and the ICDR Case Manager has confirmed that Wang Rong is the Respondents' counsel.  Mr. Wu submitted Wang Rong's letter a week late, without having sought an extension of time or offering any explanation. Under these circumstances, it would be within my discretion to exclude the letter from consideration but, in view of the importance of the jurisdictional issue, I have not so excluded it. I must, however, caution the Respondents to avoid unexcused delays in the future.

[2]   I should note, however, that Massachusetts law does not prohibit a person from testifying even on his own behalf, much less on behalf of his employer.

[3]   Infusing additional capital into a company in return for additional equity or debt instruments, for instance, does not erase boundaries between the individual and the entity.

[4]   I must stress to the Respondents that failure to respond to discovery requests or assertion of frivolous objections may constitute fair basis for adverse inferences on the merits and/or estoppel to deny the truth of certain allegations.

This message is intended only for the designated recipient(s). It may contain confidential and/or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you received this transmission in error, please notify the sender by telephone (617.227.3030) or by reply e-mail and delete this message.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW BALANCE ATHLETIC SHOE, INC, ) | CA NO.: 05CV10794GAO |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| YUNTEX ENTERPRISE (HK) LIMITED ) | |
| AND HORACE CHANG, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**ORDER**

This matter, having come before the Court, Plaintiff's Motion for Issuance of Request for

International Judicial Assistance (Letters Rogatory), and after due consideration, it is hereby:

ORDERED AS FOLLOWS:   That the Motion is allowed.

Signed this _____ day of _____, 2005.

_____
United States District Judge

bos-srv01\165983v01