UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| NEW BALANCE ATHLETIC SHOE, INC, ) | CA NO.: 05CV10794GAO |
|---|---|

NEW BALANCE ATHLETIC SHOE, INC, )            CA NO.: 05CV10794GAO
                                             )
Plaintiff,                                   )
                                             )
v.                                           )
                                             )
YUNTEX ENTERPRISE (HK) LIMITED               )
AND HORACE CHANG,                            )
                                             )
Defendants.                                  )
                                             )

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
## (LETTERS ROGATORY)

The undersigned applicant has the honor to submit this request on behalf of the Plaintiff, New Balance Athletic Shoe, Inc. ("New Balance") in the above-entitled action. The United States District Court for the District of Massachusetts presents its compliments to the judicial and other authorities of Taiwan and requests international judicial assistance to perfect service of a civil complaint and summons in a civil proceeding before this Court in the above-captioned matter.

This Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is for the appropriate authority in Taiwan, judicial or otherwise, to effectuate service of the Complaint and summons upon one of the two defendants herein, **Horace Chang,** at his last and usual residence referenced in Section 6 below.

**1.    Sender:**

United States District Court for the District of Massachusetts, One Courthouse Way, Boston, Massachusetts 02110.

**2.      Person to Whom the Executed Request is to be Returned, and Deadline for Return:**

The executed request should be returned to the Sender as expeditiously as possible.

**3.      Requesting Judicial Authority of the Requesting State, The United States of America:**

The requesting judicial authority is the United States District Court for the District of Massachusetts, by the Honorable George A. O'Toole of that Court.

**4.      Names and addresses of the parties and their legal representatives, if known:**

(a)      Plaintiff, New Balance, is a Massachusetts corporation whose principal place of business is located at Brighton Landing, 20 Guest Street, Boston, Massachusetts 02135 (United States). New Balance is represented by James P. Ponsetto, Esq., and Scott Gelin Esq., Greenberg Traurig LLP, One International Place, Boston, MA 02110.

(b)      Yuntex Enterprise (HK) Limited ("Yuntex") is a footwear distributor with its principal place of business located at Room 1219, Chevalier Commercial Centre, No. 8 Wang Hoi Road, Kowloon Bay, Kowloon, Hong Kong, China.

(c)      Horace Chang ("Chang" and, together with Yuntex, collectively the "Foreign Defendants") is an individual with a last and usual place of abode located at No 262-2 Lien Tsun Road, Feng Yuan, Taichung, Taiwan.

**5.      Nature and purpose of the proceedings and summary of the facts :**

This is an action brought by New Balance to enforce an arbitration award obtained in its favor against the Foreign Defendants. A copy of the civil complaint, titled

2

"Application to Confirm Arbitration Award and Enter Judgment upon the Award" is appended hereto as Exhibit "1" (the "Complaint"). The arbitration claim arose as a result of New Balance's assertion that the Foreign Defendants breached various trademark licensing and distribution agreements between New Balance and the Foreign Defendants and engaged in counterfeiting and infringement, and caused dilution of New Balance's trademarks after New Balance terminated those agreements.

In proceedings before the American Arbitration Association at which the arbitrators heard evidence, and based on all the evidence, the arbitrator made a "Final Award of Arbitration" in writing. The Award is dated December 22, 2004, and a copy of this award, together with the Second Partial Award (which is incorporated in, and made a part of, the Final Award of Arbitration) and First Partial Award are appended hereto as Exhibit "D" to the Complaint.

## 6.     Judicial action to be taken.

To assist this Court in resolving this dispute in a prompt, fair and efficient manner, this Court respectfully requests that the appropriate responding authority issue an order allowing service to be perfected upon Horace Chang as follows:

| Defendant | Address |
|---|---|
| Horace Chang | 262-2 Lien Tsun Road Feng Yuan Taichung Taiwan ROC 420 |

## 7.     Methods and procedures to be followed:

A copy of the Complaint and Summons should be served upon Mr. Chang consistent with Taiwan law, practice and procedure, and the original Summons, reflecting

3

the date and exact method of service, should be promptly returned to the sender,

identified in Section 1, with a copy to New Balance's representative:

James P. Ponsetto, Esq.
Greenberg Traurig, LLP
One International Place, 20th Floor
Boston, Massachusetts 02110

## 1. Reciprocity

When required, this Court shall provide similar assistance as requested herein, to

the appropriate judicial authorities of Taiwan.

## 2. Responsibility for Reimbursable Fees and Costs

The fees and costs incurred which are reimbursable will be borne by Plaintiff,

New Balance, in the first instance.  Statements for the amounts due should be sent to

Plaintiff, New Balance, in care of Greenberg Traurig, LLP at the address listed in

paragraph 1 above.

WITNESS, the Honorable George A. O'Toole, Judge of the United States District

Court for the District of Massachusetts, ___ day of June, 2005.


_____

George A. O'Toole, J.

[seal of court]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**05 CV 1 0 7 9 4 GAO**

*FILED*
*IN CLERKS OFFICE*

*2005 APR 20  P 2: 36*

*U.S. DISTRICT COURT*
*DISTRICT OF MASS.*

---

NEW BALANCE ATHLETIC SHOE, INC,

Plaintiff,

v.

YUNTEX ENTERPRISE (HK) LIMITED
AND HORACE CHANG,

Defendants.

---

## APPLICATION TO CONFIRM ARBITRATION AWARD
## AND ENTER JUDGMENT UPON THE AWARD

New Balance Athletic Shoe, Inc., by its undersigned attorneys, pursuant to the Federal

Arbitration Act, 9 U.S.C. §9 (the "FAA"), applies to this Court for (a) an Order confirming an

arbitration award and (b) the entry of final judgment upon such award on the grounds set forth

below.

### Parties

1.    New Balance Athletic Shoe, Inc. ("New Balance") is a Massachusetts corporation

whose principal place of business is located at Brighton Landing, 20 Guest Street, Boston,

Massachusetts 02135, United States.

2.    Yuntex Enterprise (HK) Limited ("Yuntex") is a footwear distributor with its

principal place of business located at Room 1219, Chevalier Commercial Centre, No. 8 Wang

Hoi Road, Kowloon Bay, Hong Kong, China.

3.    Horace Chang ("Chang") is an individual with a last and usual place of abode

located at No 262-2 Lien Tsun Road, Feng Yuan, Taichung, Taiwan

## Jurisdictional Allegations

4.    There is complete diversity of citizenship between the parties and more than

$ 75,000, exclusive of interest and costs, is at stake in this controversy; so that this Court has

jurisdiction of this matter pursuant to the provisions of 28 U.S.C. § 1332(a)(1).  Jurisdiction also

rests pursuant to 28 U.S.C. §1331 because the current action arises under the FAA, a federal

statute.

5.    Venue is proper in the District of Massachusetts because the contracts containing

the arbitration agreement between the parties are silent as to the court in which actions to enforce

arbitration awards should be filed and this is the United States Court in and for the judicial

district in which the arbitration award sought to be confirmed was made.

## Finality of Arbitration Award

6.    On January 1, 1995 New Balance entered into a Distribution Agreement and a

License Agreement with Haiku Johaco Enterprise (HK) Limited ("Johaco"). Under the

Distribution Agreement, Johaco became New Balance's exclusive distributor in China to sell

NEW BALANCE shoes (collectively hereinafter the "Agreements," annexed hereto as Exhibits

A and B, respectively).

7.    Johaco changed its name on October 31, 1997 to Yuntex Enterprise (HK) Co.,

Ltd. ("Yuntex") (the Certificate of Name Change is annexed hereto as Exhibit C).

8.    The Agreements both contain arbitration clauses stating that all disputes,

including post-termination obligations are to be settled using the Commercial Arbitration Rules

of the American Arbitration Association.  The arbitration clauses of both Agreements state that

2

any arbitration shall be held in Boston, Massachusetts and that all proceedings shall be in English. (See Distribution Agreement Section XVIII; License Agreement Section 11(i)).

9.     The Agreements also contain choice of law provisions stating that the Agreements "shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts." (See Distribution Agreement Section XVII; License Agreement Section 11(c)).

11.     Under these choice of law provisions, "[t]he decision of the arbitrators shall be final and binding and any court with proper jurisdiction shall be entitled to issue a decree enforcing the arbitral award."

12.     A dispute arose between the parties that was subject to the arbitration provision of each Agreement.

13.     Pursuant to the arbitration clause of the Agreements, the parties submitted the dispute to arbitration.

14.     The arbitrator held hearings and heard evidence, with both parties attending, and, based on all the evidence, the arbitrator made a "Final Award of Arbitrator" in writing. The award is dated December 22, 2004, and a true and correct copy of this award, together with the Second Partial Award (which is incorporated in, and made part of, the Final Award of Arbitrator) and First Partial Award are attached to this Application as Exhibit D (the "Final Award").

15.     The Defendants have failed to voluntarily satisfy the Final Award in the time since it was made. Therefore, confirmation of, and a judgment on, the Final Award is needed to permit the Petitioner, New Balance, to enforce it.

16.     This Application is authorized by the terms of the arbitration agreement and Section 9 of the FAA which provides, in pertinent part, that upon application to confirm, "the Court must grant such an order unless the award is vacated, modified or corrected". 9 U.S.C. §9.

3

# ·Greenberg
# Traurig

James P. Ponsetto
Tel. (617) 310-6073
Fax (617) 310-6001
PonsettoJ@gtlaw.com

April 19, 2005

Civil Clerk
United States District Court
One Courthouse Way
Boston, MA 02110

Re:   **New Balance Athletic Shoe v. Yuntex Enterprise**
      **(HK) Limited and Horace Chang**

Dear Sir or Madam:

Please find enclosing for filing and docketing:

(1) Application to Confirm Arbitration Award and Enter Judgment Upon the Award;
(2) Civil Action Cover Sheet; and
(3) Category Sheet.

We also enclose a check in the amount of $250.00 to cover the filing fee. Kindly
provide (2) summonses and return them to me in the stamped envelope provided for your
convenience.

Very truly yours,

James P. Ponsetto

James P. Ponsetto

JPP/ji
Enclosures
cc:   Scott Gelin, Esq.
      (w/items 1-3, but w/out attachments.)

ALBANY

AMSTERDAM

ATLANTA

BOCA RATON

BOSTON

CHICAGO

DALLAS

DENVER

FORT LAUDERDALE

LOS ANGELES

MIAMI

NEW JERSEY

NEW YORK

ORANGE COUNTY, CA

ORLANDO

PHILADELPHIA

PHOENIX

SILICON VALLEY

TALLAHASSEE

TYSONS CORNER

WASHINGTON, D.C.

WEST PALM BEACH

WILMINGTON

ZURICH

GREENBERG TRAURIG LLP
OPERATING ACCOUNT
One International Place
3rd Floor
Boston, Massachusette 02110

No. 002070

NOT NEGOTIABLE AFTER 90 DAYS FROM ISSUE

| DATE | CHECK NO. | AMOUNT |
| 04/15/05 | 2070 | $ **250.00** |

ORDER United States District Court
OF

TWO SIGNATURES REQUIRED FOR AMOUNTS EQUAL TO $50,000

GREENBERG TRAURIG LLP
OPERATING ACCOUNT

Citizens Bank

⑈002070⑈ ⑆211070175⑆ 1136440647⑈

---

| DATE | DESCRIPTION | REFERENCE | BALANCE |
|------|-------------|-----------|---------|

**Check #:  2070**          Check Date: Apr 15/05

| Inv. Date | Inv. Number | Description | Payment Amt |
|-----------|-------------|-------------|-------------|
| 4/15/05 | 17041505250 | Court Fee - 43647.018500 | 250.00 |

# DETACH

PLEASE DETACH BEFORE DEPOSITING

| DATE | DESCRIPTION | REFERENCE | BALANCE |
|------|-------------|-----------|---------|

# DETACH

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFF

New Balance Athletic Shoe, Inc.

**DEFENDANTS**

Yuntex Enterprise (HK) Limited and Horace Chang

(b) County of Residence of First Listed Plaintiff  __Suffolk, (MA)__
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed  Foreign
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
James P. Ponsetto
Greenberg Traurig, LLP
One International Place, 20th Fl.
Boston, MA 02110   (617) 310-6000

Attorneys (If Known)

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | Act | ☐ 863 DIW C/DIW W (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 730 Labor/Mgmt. Reporting | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 740 Railway Labor Act | | Determination Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | ☐ 871 IRS—Third Party | State Statutes |
| | | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | ☒ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | Security Act | | 9 U.S.C. §9 |

## V. ORIGIN  (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
another district
(specify)

☐ 6  Multidistrict
Litigation

☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

9 U.S.C. §9 (Petition to enforce arbitration award)

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions):

N/A

JUDGE

DOCKET NUMBER

DATE  4/19/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1.  **TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)**

2.  **CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).**

    __  I.     160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    ✸  II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
               740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.         for patent, trademark or copyright  cases

    __  III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
               315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
               380, 385, 450, 891.

    __  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
               690, 810, 861-865, 870, 871, 875, 900.

    __  V.    150, 152, 153.

3.  **TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.**

    n/a

4.  **HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?**
                                                        YES ☐        NO ☒

5.  **DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST?   (SEE 28 USC §2403)**
                                                        YES ☐        NO ☒

    **IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?**
                                        n/a             YES ☐        NO ☐

6.  **IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC §2284?**
                                                        YES ☐        NO ☒

7.  **DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).**
                                                        YES ☐        NO ☒

        1.      IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?          EASTERN DIVISION ☐

                CENTRAL DIVISION ☐                    WESTERN DIVISION ☐

        2.      IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING GOVERNMENTAL AGENCIES, RESIDING
                IN MASSACHUSETTS RESIDE?

                EASTERN DIVISION ☒          CENTRAL DIVISION ☐          WESTERN DIVISION ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME
ADDRESS

TELEPHONE NO.

(COVER SHEET LOCAL.WPD  - 1/27/00)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| |
|---|
| NEW BALANCE ATHLETIC SHOE, INC, <br><br> Plaintiff, <br><br> v. <br><br> YUNTEX ENTERPRISE (HK) LIMITED <br> AND HORACE CHANG, <br><br> Defendants. |

## APPLICATION TO CONFIRM ARBITRATION AWARD
## AND ENTER JUDGMENT UPON THE AWARD

New Balance Athletic Shoe, Inc., by its undersigned attorneys, pursuant to the Federal Arbitration Act, 9 U.S.C. §9 (the "FAA"), applies to this Court for (a) an Order confirming an arbitration award and (b) the entry of final judgment upon such award on the grounds set forth below.

### Parties

1.    New Balance Athletic Shoe, Inc. ("New Balance") is a Massachusetts corporation whose principal place of business is located at Brighton Landing, 20 Guest Street, Boston, Massachusetts 02135, United States.

2.    Yuntex Enterprise (HK) Limited ("Yuntex") is a footwear distributor with its principal place of business located at Room 1219, Chevalier Commercial Centre, No. 8 Wang Hoi Road, Kowloon Bay, Hong Kong, China.

3.    Horace Chang ("Chang") is an individual with a last and usual place of abode located at No 262-2 Lien Tsun Road, Feng Yuan, Taichung, Taiwan

## Jurisdictional Allegations

4.      There is complete diversity of citizenship between the parties and more than

$ 75,000, exclusive of interest and costs, is at stake in this controversy; so that this Court has

jurisdiction of this matter pursuant to the provisions of 28 U.S.C. § 1332(a)(1). Jurisdiction also

rests pursuant to 28 U.S.C. §1331 because the current action arises under the FAA, a federal

statute.

5.      Venue is proper in the District of Massachusetts because the contracts containing

the arbitration agreement between the parties are silent as to the court in which actions to enforce

arbitration awards should be filed and this is the United States Court in and for the judicial

district in which the arbitration award sought to be confirmed was made.

## Finality of Arbitration Award

6.      On January 1, 1995 New Balance entered into a Distribution Agreement and a

License Agreement with Haiku Johaco Enterprise (HK) Limited ("Johaco"). Under the

Distribution Agreement, Johaco became New Balance's exclusive distributor in China to sell

NEW BALANCE shoes (collectively hereinafter the "Agreements," annexed hereto as Exhibits

A and B, respectively).

7.      Johaco changed its name on October 31, 1997 to Yuntex Enterprise (HK) Co.,

Ltd. ("Yuntex") (the Certificate of Name Change is annexed hereto as Exhibit C).

8.      The Agreements both contain arbitration clauses stating that all disputes,

including post-termination obligations are to be settled using the Commercial Arbitration Rules

of the American Arbitration Association. The arbitration clauses of both Agreements state that

2

any arbitration shall be held in Boston, Massachusetts and that all proceedings shall be in English. (See Distribution Agreement Section XVIII; License Agreement Section 11(i)).

9.    The Agreements also contain choice of law provisions stating that the Agreements "shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts." (See Distribution Agreement Section XVII; License Agreement Section 11(c)).

11.    Under these choice of law provisions, "[t]he decision of the arbitrators shall be final and binding and any court with proper jurisdiction shall be entitled to issue a decree enforcing the arbitral award."

12.    A dispute arose between the parties that was subject to the arbitration provision of each Agreement.

13.    Pursuant to the arbitration clause of the Agreements, the parties submitted the dispute to arbitration.

14.    The arbitrator held hearings and heard evidence, with both parties attending, and, based on all the evidence, the arbitrator made a "Final Award of Arbitrator" in writing. The award is dated December 22, 2004, and a true and correct copy of this award, together with the Second Partial Award (which is incorporated in, and made part of, the Final Award of Arbitrator) and First Partial Award are attached to this Application as Exhibit D (the "Final Award").

15.    The Defendants have failed to voluntarily satisfy the Final Award in the time since it was made. Therefore, confirmation of, and a judgment on, the Final Award is needed to permit the Petitioner, New Balance, to enforce it.

16.    This Application is authorized by the terms of the arbitration agreement and Section 9 of the FAA which provides, in pertinent part, that upon application to confirm, "the Court must grant such an order unless the award is vacated, modified or corrected". 9 U.S.C. §9.

3

17.    This Application is timely because it is filed within one (1) year after the Final

Award was made.

18.    The Defendants have not timely moved to vacate, modify or correct the Final

Award and they have therefore waived the right to do so.

WHEREFORE, the Petitioner prays for the following relief:

a.    That this Court make an order confirming the Final Award, as authorized by

Section 9 of the FAA;

b.    That this Court enter a judgment that conforms to the Final Award;

c.    That the Petitioner be awarded its costs and disbursement in this proceeding; and

d.    That the Petitioner have any and all other relief that the court deems just and

proper.

Dated: Boston, Massachusetts
April 18, 2005
      19

Respectfully submitted,
NEW BALANCE ATHLETIC
SHOE, INC.
By Its Attorneys,

James Ponsetto (556144)
GREENBERG TRAURIG, LLP
One International Place
20th Floor
Boston, MA 02110
*Attorneys for Petitioner*

bos-srv01\155478v01

4

## DISTRIBUTION AGREEMENT

THIS AGREEMENT, made and entered into by and between:

NEW BALANCE ATHLETIC SHOE, INC., a company duly organized and existing under the laws of the Commonwealth of Massachusetts (hereinafter "COMPANY"),

ON THE ONE HAND,

AND

HAIKU JOHACO ENTERPRISE CO., LTD., a limited liability company formed under the laws of the Peoples Republic of China (hereinafter the "Distributor"),

ON THE OTHER HAND.

WHEREAS Distributor desires to obtain from COMPANY and COMPANY desires to grant to Distributor, on the terms and conditions set forth below, the exclusive right to import, sell and distribute the Products (as hereinafter defined) in the Territory (as hereinafter defined); and

WHEREAS COMPANY is entering into this Agreement based on assurances that Distributor will devote its best efforts to market and sell said Products in the Territory and otherwise adhere to all the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants herein set forth, the parties hereby agree as follows:

I.    APPOINTMENT OF DISTRIBUTOR

1. COMPANY hereby appoints Distributor, which accepts, for the term of this Agreement and subject to the terms and conditions hereof, its exclusive distributor to distribute and sell the Products (as hereinafter defined) at retail and to retail dealers and others who sell to ultimate users in the geographical territory described in Article II below (the "Territory"). The term "Products" shall mean COMPANY's footwear and clothing products as set forth in the COMPANY's current published price list for export sales, a copy of which has been delivered to Distributor, and shall also include (i) footwear and clothing products of both first quality and second quality (as the term "seconds" is hereinafter defined) and (ii) any new footwear and clothing products carrying the trademarks, tradenames and logos referred to in Annex C except where COMPANY advises Distributor at least ten (10) days prior to COMPANY's offering the new products for sale of such new products' non-inclusion under this Agreement, in which case COMPANY reserves full rights to market, sell and distribute such new products by any other means. For purposes hereof, the term "seconds" shall mean any Products which in COMPANY's judgment are not of first quality. Said exclusive designation shall restrictively mean that COMPANY shall not appoint any third party located within the Territory for the sale or distribution in the Territory of the

Products to retail dealers and others who sell to ultimate users. It is further understood that Distributor shall not appoint any assistant or subsidiary distributors in the Territory for the purpose of selling and distributing the Products without the prior written consent of COMPANY, which consent will not be unreasonably withheld. Distributor hereby undertakes at all times during the term of this Agreement to use its best efforts to vigorously and continuously promote and sell the Products throughout the entire Territory. The appointment of Distributor by COMPANY is on an "intuitu personae" basis.

2. Notwithstanding the appointment of Distributor as exclusive distributor as provided above, it is expressly understood and agreed that COMPANY shall be entitled to grant exclusive and/or non-exclusive manufacture, distribution and/or trademark licenses covering the Products outside of the Territory and COMPANY shall have no liability for breach of this Agreement for acts in connection with such appointment or the acts of such licensees or contract manufacturers. COMPANY expressly disclaims any representation, covenant or warranty that Products shall not be sold in the Territory by any such licensee or other third party.

## II.    TERRITORY

The term "Territory" as used in this Agreement shall mean the area or country set forth in Annex A. Distributor is appointed distributor only for the Territory and shall not distribute or sell, or assist in the distribution or sale of, any Products in or to any parties located in any other country. Distributor shall not distribute or sell Products to any person or entity which Distributor knows or should know will distribute or sell Products outside the Territory.

## III.   TERM

1. The original term of this Agreement shall be for a period of one year commencing on the date hereof and terminating on the first anniversary of the date hereof at which time, if either party notifies the other in writing at least ninety (90) days before the end of said period of its intention to let the contract expire at the end of said period, it shall so automatically expire.

2. If neither party sends the notice indicated in Section III.1 above, this Agreement shall be automatically renewed, at the end of the period provided in Section III.1, for further successive one-year periods, provided, however, that in the event of such renewal(s) either party can then, in its sole discretion, with or without cause, and without the payment of any termination indemnities or similar payments, terminate this Agreement effective as of the end of any one-year renewal period by written notice to the other party sent at any time prior to ninety (90) days before the end of such one-year renewal period.

2

IV.    TERMS AND CONDITIONS OF SALE TO DISTRIBUTOR

Distributor undertakes and agrees to purchase the Products from COMPANY and its affiliates under the following terms and conditions (For the purposes of this Agreement, "affiliate" and "affiliated company" shall mean any legal entity controlled directly or indirectly to the extent of a holding of at least fifty (50%) percent of the share capital of such entity by either of the parties or so controlled by or under such common control with one of them):

1.    Price:

The initial prices to be paid by Distributor to COMPANY or its affiliated company as the case may be, for the Products shall be the prices set forth in the COMPANY's current published price list for export sales, a copy of which has been delivered to Distributor; provided, however, that any or all of such prices to the Distributor, may be increased or decreased from time to time in COMPANY's discretion effective after thirty (30) days notice thereof by COMPANY or its affiliates, as the case may be, to Distributor. Such prices are exclusive of handling, shipping and insurance charges, inspection fees, consular fees, import or export duties, taxes, and levies (including but not limited to, value added, property, sales, use, or similar taxes), whether imposed by the United States or any other foreign, state or local government entity, all of which shall be the sole responsibility of the Distributor. If COMPANY is required to collect or pay any such taxes, the amounts so paid or collected shall be invoiced to Distributor.

2.    Payment:

Payment of all amounts due hereunder and all payment documentation, including irrevocable letters of credit, for the purchase of the Products shall be effected by Distributor in accordance with COMPANY's conditions of payment which are set forth in Annex B hereto. All payments shall be made in the currency used in the price list referred to in Section IV.1 above. In addition to the other rights hereunder of COMPANY or its affiliated companies, as the case may be, and without in any manner excusing such violation, the Distributor agrees to pay interest at the rate of two percent (2%) per month (or, if the applicable usury rate does not permit 2% per month, then at the maximum interest rate permitted by law) for any payments not received when due. The Distributor shall pay all customs duties, VAT and other taxes and charges arising in connection with the transportation, importation, sales and use of the Products it purchases notwithstanding that title to such Products remains with COMPANY or its affiliated companies until fully paid. It is understood and agreed that without prejudice to any other of its rights, COMPANY and its affiliated companies may withhold all shipments of Products if Distributor has not paid an invoice when due.

3

3.       Acceptance of Orders:

All purchase orders for the Products shall be in writing or by telefax. All orders and/or modifications placed by Distributor under this Agreement shall be subject to acceptance by COMPANY or its affiliated company and no such order shall be binding until accepted by COMPANY or its affiliated company. Acceptance shall be deemed to have been given if COMPANY or its affiliated company does not, within thirty (30) days of actual receipt of an order, notify Distributor of its rejection thereof. Distributor may not cancel an accepted order without COMPANY's or the affiliated company's (as the case may be) written consent. COMPANY and each affiliated company shall be entitled (without incurring any liability toward Distributor, or any assistant or subsidiary dealer of Distributor or any customer) to cancel accepted orders prior to delivery to Distributor in the event that, prior to delivery, notice of termination of this Agreement has been given or in the event that this Agreement shall have been otherwise terminated for any reason. All order forms used for the placing by Distributor of orders for the Products in the Territory shall be subject to the prior approval of COMPANY or the affiliated company to which the order is sent and, in any event, the terms of this Agreement shall supersede any terms and conditions on such order forms used by Distributor.

4.       Title and Delivery Schedules:

(a) It is expressly understood and agreed between the parties that Products delivered to the Distributor shall remain the property of COMPANY or its affiliated company, as the case may be, until the entire value of the invoices issued in relation thereto has been collected by COMPANY or its affiliated company, as the case may be. Therefore, partial or conditional payment shall not be considered as valid payment for the transfer of title to the property from COMPANY or its affiliated company, as the case may be, to the Distributor. Distributor shall use its best efforts in assisting COMPANY or its affiliated company, as the case may be, and in taking all measures required or useful in order to protect such right and title to the property consisting of the Products until full payment therefor has been received by COMPANY or its affiliated company, as the case may be. Notwithstanding the retention of title in the Products, risk of loss therefor shall pass to the Distributor at the factory loading point and COMPANY or its affiliated company shall have no responsibility for any damages or losses attributable to the carrier. Distributor shall procure insurance from a reliable insurance company covering the Products and the interest of COMPANY or its affiliated company therein.

It is further expressly understood and agreed that all free samples, advertising material, technical, sales, marketing and other documents or material delivered to the Distributor on a complimentary basis shall remain the property of COMPANY or its affiliated company and shall be immediately returned upon request and in all cases upon termination of this Agreement.

4

(b) Delivery schedules stated by COMPANY or its affiliated company to Distributor upon acceptance of an order or otherwise are given as an indication only and shall not be binding upon COMPANY or its affiliated company. However, a specific delivery schedule may be required by Distributor for a particular order and, once explicitly accepted as such by COMPANY or its affiliated company, as the case may be, it shall be binding upon the company so accepting and if it fails to comply therewith, Distributor shall as its exclusive remedy have the right to cancel the order in question if said scheduled date is more than thirty (30) days overdue.

5. <u>Product Availability</u>:

COMPANY and its affiliates will endeavor to make the Products available in the quantities and at the times specified by the Distributor in its purchase orders, but in case of a shortage in the Products, COMPANY and its affiliates reserve the right to allocate available supplies to their various distributors and customers in such a way as they may reasonably determine. COMPANY and its affiliates shall review and decide whether to approve, on a case-by-case basis, all orders requiring modifications to the Products.

6. <u>Product Identification</u>:

Distributor shall not remove or otherwise modify COMPANY's tradenames or trademarks as they appear on the Products sold to Distributor. Distributor shall not, without COMPANY's written consent, place any other tradenames or trademarks on such Products.

7. <u>Product Changes</u>:

COMPANY and its affiliates reserve the right without thereby incurring any liability to Distributor or to Distributor's customers, from time to time, to terminate, limit or significantly modify or change the basic specifications of any Product and to effect any other changes and/or improvements in any Product without prior notice to Distributor.

8. <u>Government Authorization</u>:

Distributor, at its own expense, shall obtain all necessary permits and licenses for the importation of the Products into the Territory and shall secure all necessary regulatory approval for, and shall be responsible for compliance with local law with respect to, the distribution, sale or use of the Products within the Territory. COMPANY shall cooperate with the Distributor in obtaining such approvals.

5

**V.**   GENERAL COMMERCIAL CONDITIONS

    1.   Sales Structure:

        The parties initially contemplate that Distributor will operate a retail sales facility in Guanzhou Province and will service other retail outlets from that location. During the term, Distributor in cooperate with COMPANY will evaluate the opening of retail outlets in other provinces. In connection therewith, Distributor shall at its own expense employ a trained and qualified staff to promote and sell the Products and in accordance with Distributor's undertaking herein to at all times vigorously and continuously use its best efforts to promote and sell the Products.

    2.   Assistance to Customers:

        Distributor shall furnish all appropriate information regarding the Products to existing and potential customers in the Territory.  Distributor shall reply promptly to all requests for information as well as to all correspondence or purchase orders from said customers.  COMPANY and its affiliates may send its own representatives to visit and advise customers in the Territory, provided that such visits shall be set up in advance on a schedule agreed upon with the Distributor.

    3.   Inventory:

        Distributor agrees that at the end of each month during the term of this Agreement it will have in inventory such quantity of Products as shall be sufficient in the agreed judgments of COMPANY and Distributor to promptly and efficiently permit Distributor to supply customers in the Territory.

    4.   Safety Health and Other Regulations:

        Distributor shall keep COMPANY informed in writing of all administrative and/or technical regulations applicable to the Products in the Territory; however, COMPANY shall be sole judge of whether it will modify or cause to be modified any of the Products in order to conform to any such regulations and COMPANY shall be under no obligation to so modify or cause to be modified any of the Products.

    5.   Resale Prices:

        Distributor is free to set its resale prices.  Such resale prices shall at all times be set forth in a current price list for the Products maintained by Distributor.

6.  Reports of Operation/Accurate Records:

(a)  Distributor shall promptly make available to COMPANY during the term of this Agreement such information as COMPANY shall reasonably request periodically and the following information once per year, on or about 1 September, with respect to both current and the coming years:

(i)  actual and forecast sales of each of the Products in the Territory as well as Distributor's marketing plan for the upcoming year;

(ii)  Distributor's inventory of Products;

(iii)  Distributor's advertising and promotion campaigns and expenditures;

(iv)  the potential and existing market, the outlook and trends for the sale of the Products in the Territory, as well as all information on competition (including prices, terms of sales, etc.), on marketing techniques and on significant changes in laws, regulations and practices in the Territory with regard to the importing and sales of the Products.

(b)  It is understood and agreed that the prompt rendering of the aforesaid reports and statements are material obligations of Distributor without which COMPANY would not have been prepared to sign this Agreement. All information and reports provided to COMPANY pursuant to Section V.6(a) shall be treated as confidential material.

(c)  COMPANY and the Distributor each agree to maintain accurate and complete books, records and accounts of transactions under this Agreement.

(d)  COMPANY and the Distributor will mutually agree on how the information provided for in Section V.6(a) above will be made available by the Distributor.

7.  Product Advertising and Marketing Expenditures:

Distributor shall:

(a)  at its own cost be responsible for adequate advertising of the Products in the Territory (which shall at all times be properly and exclusively (unless COMPANY otherwise agrees in writing) identified with COMPANY's trademarks and tradenames) and the active promotion of sales of the Products throughout the entire Territory.

Distributor further undertakes to expend annually to unrelated third parties at least the amounts for each such annual period set forth in Annex C for advertising

7

and co-op advertising, printed and point-of-sale promotional material, sales promotion and similar marketing activities, consistent with the Distributor's marketing plan, as submitted to COMPANY pursuant to Section V.6(a) hereof.

(b) participate at its own cost in all appropriate expositions within the Territory for the showing of the Products.

(c) express and identify properly in its communications with each customer the "Authorized Distributor" relationship with COMPANY for the Products.

(d) not engage in, publish, cause to be published, encourage or approve any advertisement or practice which might mislead or deceive the public or might be detrimental to the good name, trademarks, tradenames, goodwill or reputation of COMPANY or the Products.

Distributor agrees to consider the advice and suggestions of COMPANY with regard to Product advertising and promotion. Distributor further agrees, upon request, to promptly discontinue any advertising or practice reasonably deemed by COMPANY to have a detrimental effect as aforesaid. The Distributor shall not advertise the Products outside the Territory.

8.    Commercial Practices:

The Distributor shall at all times respect normal commercial practices and the rules of fair competition in each country of the Territory. It shall engage in no practices which could be detrimental or embarrassing to COMPANY or its parent or affiliated companies.

9.    Purchases from Licensees:

In addition to purchase of Products from COMPANY and its affiliates, Distributor shall also be entitled to purchase Products from authorized licensees of COMPANY. Any such purchases shall be upon the terms and at such prices as may be negotiated and/or agreed to between Distributor and the licensees.

VI.    INTENTIONALLY OMITTED.

VII. DISTRIBUTION OF OTHER PRODUCTS

1.    Distributor agrees during the term of this Agreement and for a period of one year after its termination, expiration or non-renewal for any reason whatsoever not to manufacture, sell, distribute or otherwise handle in the Territory any competing products to the Products. "Competing products" shall mean any products similar to the Products or

8

which can be put to identical or similar uses or which might compete with or hinder the sale of the Products.

2. Distributor expressly agrees during the term of this Agreement and for a period of one year after its termination, expiration or non-renewal for any reason whatsoever not to directly or indirectly facilitate the distribution and/or sale of any competing products or to hold or acquire, directly or indirectly, any participation in any organization or entity selling, distributing or otherwise handling competing products as defined herein. Non-compliance by Distributor with the provisions of this paragraph during the term hereof shall be good cause for COMPANY to terminate this Agreement pursuant to Section XIII.1(a) below.

3. In the event that this Article VII or any portion thereof shall be held by a court or arbitration panel, administrative body or governmental agency of competent jurisdiction to be invalid, illegal or unenforceable for any reason whatsoever, it is expressly understood and agreed that as to such jurisdiction the foregoing restrictions set forth in Article VII shall be automatically considered modified to embrace the greatest possible time and area of restriction then permitted under applicable law, and such invalidity, illegality or unenforceability of this Article VII or any portion thereof shall not impair the enforceability of these restrictions as so modified nor in any manner otherwise affect the remaining provisions of this Agreement.

VIII. RETURN AND PURCHASE OF INVENTORY

1. In the event of termination, expiration or non-renewal of this Agreement for any reason whatsoever, COMPANY shall from and after the date of notice of such termination having been given by either party be entitled to cease accepting orders for any Products. On the effective date of termination, all Products and other materials and documents as referred to in Section IV.4 which are in the possession or under the control of Distributor which remain the property of COMPANY or any affiliated company shall be immediately returned to COMPANY by Distributor. Within thirty (30) days of the effective date of such termination, expiration or non-renewal, Distributor shall submit to COMPANY an inventory list of all unsold Products which are the property of Distributor as of the date of the said termination, expiration or non-renewal. COMPANY may (in its sole discretion) in all cases repurchase or cause its affiliated company to repurchase all or any part of such inventory by notifying Distributor in writing. Under no circumstances regardless of the cause of termination of this Agreement (including COMPANY's default) shall COMPANY be required to repurchase such inventory. The price for any such inventory repurchased shall be COMPANY's or the affiliate's, as the case may be, actual selling price therefor to Distributor (excluding shipping, insurance and customs costs). The transportation and packing costs for the Products owned by COMPANY or its affiliated company or repurchased as provided above shall be paid by the Distributor. Distributor shall in any event return to COMPANY and its affiliates free of charge all Products, materials and equipment which they may have made available to Distributor free of charge.

9

2.    In the event that COMPANY and its affiliates should not repurchase or should repurchase only part of the inventory mentioned in the preceding paragraph, Distributor shall have the right, under the terms and conditions of this Agreement, to sell the said inventory or that part of the inventory not repurchased for a period of one hundred twenty (120) days after the date of termination. After such date, all sales by Distributor of any Products held in inventory on the date of termination shall end.

## IX.  TRADEMARKS

1.    Distributor acknowledges that the trademarks, tradenames and logos set forth in Annex C are the exclusive property of COMPANY and Distributor undertakes throughout the term of this Agreement to display prominently said trademarks, tradenames and logos in publications, signs and displays and in other suitable advertising and sales promotion media in association with the names and/or illustrations of the Products or the Products themselves, provided that such use shall at all times be in compliance with such rules and regulations regarding the use of COMPANY's trademarks and tradenames as COMPANY shall furnish to the Distributor. Neither the Distributor nor any assistant or subsidiary dealer of Distributor shall acquire any right or interest whatsoever, as a result of this Agreement, in any patents, trademarks, tradenames, logos or other industrial property rights of COMPANY or will use same in any manner except as explicitly authorized by COMPANY.

2.    If any case of unfair competition or infringement by third parties in the Territory of the trade names, trademarks or other industrial property rights of COMPANY comes to the knowledge of Distributor, the latter will inform COMPANY immediately. COMPANY will, at its own discretion, decide whether it will prosecute any such case of which it is so notified and in what manner it will prosecute. At the request of COMPANY, Distributor will assist COMPANY to the best of its ability.

## X.  AUTHORITY OF DISTRIBUTOR

1.    The relationship between COMPANY and Distributor is and will remain that of seller and buyer and independent contractor. Distributor, its agents and employees are in no way the sales representatives or agents of COMPANY for any purpose whatsoever and have no right or authority to represent themselves or act as such or in any way to bind COMPANY to any obligation to a third party, and they shall not assume or create in writing or otherwise any obligation of any kind, express or implied, in the name of or on behalf of COMPANY, unless specifically authorized to do so in writing by COMPANY and in accordance with the conditions specified by COMPANY.

10

2.     The Distributor warrants and agrees that it shall be at all times an independent
contractor, and that it shall do business at its own risk and for its own profit and not as an
agent or employee of COMPANY or of any of its affiliated companies.

## XI.    WARRANTY AND RETURNED PRODUCTS

### 1.    Warranty

(a)     COMPANY and its affiliated companies, as the case may be, warrant
its respective Products against defects in workmanship and material for a period of sixty (60)
days from the date of shipment from the factory under normal use and service and otherwise
only when such product is used in accordance with instructions furnished. Liability under
this warranty shall be limited to the replacement or repair, F.O.B. point of manufacture, of
any defective Product which, having been returned to the factory, transportation charges
prepaid, has been inspected and determined to be defective. THIS WARRANTY IS IN
LIEU OF ANY OTHER WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO
DESCRIPTION, QUALITY, MERCHANTABILITY, FITNESS FOR ANY PARTICULAR
PURPOSE OR USE, OR ANY OTHER MATTER.  Under no circumstances shall
COMPANY or any affiliated company be liable to Distributor or any third party for any loss
of profits or other direct or indirect costs, expenses, losses or consequential damages arising
out of or as a result of any defects in or failure of its Products or arising out of or as a result
of parts or components incorporated in the Products but not supplied by the COMPANY or
any affiliated company.

(b)     It is expressly understood and agreed by the parties hereto that
(i) COMPANY and its affiliated companies extend no warranty whatsoever (whether express
or implied) with respect to any sales of seconds of the Products and that (ii) in no event shall
the warranty provided for in Section XI.1(a) hereof be applicable thereto.

(c)     Any warranty or guarantee by COMPANY or any affiliated company
with respect to the Products sold by it shall be specifically limited to those obligations which
are expressly provided in Section XI.1(a) hereof unless the relevant sales acknowledgement
form provides an alternative warranty or guarantee. In no event shall COMPANY or any
affiliated company be liable to Distributor or to any third parties purchasing through
Distributor for any consequential or incidental damages or losses, for injury to persons or
property or for commercial loss.

(d)     In the event Distributor should extend to any party or person a
warranty different from the warranty set forth in Section XI.1(a) hereof, Distributor shall be
exclusively responsible for said extended warranty, and shall support all consequences
thereof and shall hold COMPANY or any affiliated company harmless of any obligation
deriving therefrom.

11

2.    Returned Products

COMPANY and its affiliated companies will accept no returns for credit either from Distributor or from any customer unless the company which sold the Product to Distributor gives written permission, in each case, in advance.  In no case will such company consider accepting the return of any Products which are not (i) in good merchantable condition comparable to such company's prevailing standards, (ii) in its standard product line and (iii) in active demand.  In cases where such company gives its written permission for a specific return for credit, the credit given will be based upon the originally invoiced price of the returned Product. .

## XII. CONFIDENTIALITY

1.    Distributor acknowledges that all technical and commercial information and know-how furnished by COMPANY and its affiliated companies to Distributor during the term of this Agreement is proprietary and is of a highly confidential and secret nature.

2.    All of such technical and commercial information and know-how is given and received in strict confidence and is to be used by Distributor solely for the purpose of carrying out this Agreement.  Distributor shall keep in strict confidence the aforesaid technical and commercial information and know-how and shall not, for any reason whatsoever, reveal, disclose, sell or transfer any part of such technical or commercial information or know-how, directly or indirectly, to its own employees or agents or to any third party except as permitted by the terms of this Agreement.

3.    In the performance of its obligations under this Article XII, Distributor shall at its own cost take all precautions and steps which may be reasonably requested in order to protect such know-how and confidential information (including the bringing of legal action in order to ensure that others respect this undertaking of confidentiality).  Nothing herein shall be interpreted as prohibiting COMPANY or its affiliated company at its own expense from bringing such legal actions within or outside the Territory as it shall deem to be in its best interest.

4.    Distributor shall have the right to disclose said technical information and know-how received only to those of Distributor's employees and its assistant and subsidiary distributors who require same and Distributor agrees to exercise a high degree of care in the selection of its employees and assistant and subsidiary distributors to whom said technical information and know-how, or any part thereof, will be disclosed.

5.    Distributor's obligations set forth in this Article XII shall survive and remain in effect even after the expiration or the termination of the present Agreement.

12

6.      It is expressly agreed that the obligations of Distributor to keep confidential information under this Article XII shall not apply to any such information which:

(a)      was in the public domain at the time of disclosure to Distributor;

(b)      was in the possession of Distributor without binder of secrecy prior to disclosure to it; or

(c)      though confidential at the time of disclosure, subsequently becomes part of the public domain through no fault of the Distributor.

7.      Distributor shall inform COMPANY without delay of any and all violations within the Territory which come to Distributor's attention of COMPANY's and its affiliated companies' rights in the technical and commercial information and know-how covered by this Agreement. If COMPANY or its affiliated company, after consultation with Distributor but in its entire discretion, should decide to institute a legal action in its own name, it may do so at its own expense, provided however that Distributor may, at its option, participate in such legal action, in which case each party shall pay its own expenses in connection with such an action, including fees of legal counsel. COMPANY or its affiliated company, as the case may be, shall have the final decision with regard to the conduct of all such legal actions and shall retain all settlements, recoveries and judgments arising therefrom, after reimbursement to Distributor for out of pocket expenses, if any, incurred by Distributor in connection with such legal action at COMPANY's or its affiliate's specific request. If Distributor decides not to participate in such legal action, it shall at Distributor's expense cooperate with COMPANY or its affiliate, as the case may be, and assign to it without compensation any claims it may have.

## XIII. ANTICIPATORY TERMINATION

1.      Notwithstanding any other provisions of this Agreement, this Agreement may be terminated before the expiration of its term without payment by COMPANY of any indemnity or other sums on account of such termination, under the following circumstances:

(a)      by either party if within thirty (30) days after notification to the other party, advising said other party of a failure to fulfill any of its obligations under this Agreement (including without limitation the minimum purchase requirements set forth in Section VI.1) or of a violation of or a default under the terms of this Agreement, said other party has not cured such failure, violation or default;

(b)      by COMPANY (i) if a change occurs in the control of Distributor (whether such change is in direct or indirect control), or (ii) if a change or disruption occurs in Distributor's management, commercial or financial situation which change has or might, in COMPANY's reasonable judgment, substantially adversely affect the performance by Distributor of its obligations under this Agreement, including without limitation the death,

13

incapacity to perform his duties of employment for a continuous period of ninety (90) days or the termination of his employment and/or management relation with Distributor of the person signing this Agreement on behalf of Distributor (in relation herewith, Distributor undertakes and agrees to notify COMPANY of any such change as soon as it occurs or as soon as it is likely to occur), or (iii) if Distributor is in a state of cessation of payments when due in their normal course, if any action involving bankruptcy, rights of creditors or insolvency is brought concerning Distributor or if Distributor makes an assignment for the benefit of creditors or if a court appointed person is designated to operate the Distributor or if a referee in bankruptcy or similar official is named;

(c)     upon termination of any license agreement between COMPANY and Distributor for any reason whatsoever; or

(d)     by mutual consent of the parties hereto.

2.    Termination of this Agreement as provided in paragraphs (a) and (b) of Section XIII.1 shall be by written notice and shall be effective ten (10) days following receipt, except in the case of Sections XIII.1(b)(iii) or XIII.1(c), in which case the termination is automatic (without notice) upon the occurrence of the event.


## XIV. TERMINATION

1.     COMPANY SHALL HAVE NO LIABILITY TO DISTRIBUTOR OR DISTRIBUTOR'S CUSTOMERS OR OTHER THIRD PARTIES, FOR CLAIMS OR DAMAGES OF ANY KIND, INCLUDING INCIDENTAL OR CONSEQUENTIAL DAMAGES, ARISING OR RESULTING SOLELY FROM TERMINATION OF THIS AGREEMENT IN ACCORDANCE WITH ITS TERMS. Notwithstanding any laws or regulations in the Territory to the contrary, COMPANY shall not be liable to Distributor on account of the termination or expiration of this Agreement for reimbursement or damages for loss of goodwill, prospective profits or anticipated orders, or on account of any expenditures, investments, leases or commitments made by Distributor or for any other reason whatsoever based upon or growing out of such termination or expiration. Distributor waives any right it may have to receive any compensation or reparations on termination or expiration of this Agreement. Notwithstanding any laws or regulations in the Territory to the contrary, Distributor acknowledges and agrees that (i) Distributor has no expectation and has received no assurances that its business relationship with COMPANY will continue beyond the stated term of this Agreement or its earlier termination in accordance with Article XIII hereof, or that any investment by Distributor in the promotion of Products will be recovered or recouped by virtue of this Agreement; and (ii) Distributor shall not have or acquire by virtue of this Agreement or otherwise any vested, proprietary or other right in the promotion of Products or in any goodwill created by its efforts hereunder. The parties acknowledge that this Section XIV.1. has been included as a material inducement for COMPANY to enter into this Agreement and that COMPANY would not have entered into this Agreement but for the limitations of liability as set forth herein.

14

2.    The termination, expiration or non-renewal of this Agreement shall not relieve Distributor of any liability for any monies due to COMPANY or any affiliated company at the time of such termination, expiration or non-renewal nor shall it relieve Distributor of the post-termination obligations imposed by this Agreement.

3.    Upon such termination, expiration or non-renewal, the Distributor shall immediately remove from its premises and elsewhere all signs and advertising relating to COMPANY and the Products and shall thereafter cease all use of the trademarks, tradenames and logos set forth in Annex C and all other trademarks and tradenames identified with the Products and Distributor shall ensure that all such use by any assistant or subsidiary distributors or others claiming rights from Distributor shall also immediately cease. Upon such termination, expiration or non-renewal, Distributor agrees promptly to return to COMPANY all technical, sales, marketing and other confidential documents which COMPANY or any affiliated company may have supplied to it, as well as, to the best of Distributor's ability, all copies thereof.

## XV. FORCE MAJEURE

COMPANY shall not under any circumstances be liable for any claim whatsoever or however arising of Distributor or any of its customers or any other third party due to COMPANY's failure of or any delay in performance of any of its obligations arising in connection with this Agreement if the performance of such obligation is prevented, restricted or materially interfered with as a result of any acts, causes or circumstances beyond the reasonable control of COMPANY, including without limitation acts of God, acts or omissions of any other entity or person (including suppliers of the Products or parts or components thereof), fire, flood, strike or labor dispute of any kind, embargo, war, riot, insurrection or civil or military authority.

## XVI. INSPECTION

Upon request, COMPANY and its representatives shall have reasonable access, during normal working hours, to Distributor's place(s) of business and inventory stock to ascertain Distributor's compliance with this Agreement.

## XVII. GOVERNING LAW

This Agreement shall be deemed to have been entered into in the Commonwealth of Massachusetts, U.S.A. and shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, U.S.A. without giving effect to principles of conflicts of law. This Agreement has been executed in the English language and any interpretation or construction of this Agreement shall be based solely on the English language official text.

15

## XVIII. ARBITRATION

The parties agree that any and all disputes related to or stemming from this Agreement, its application and/or termination (including post-termination obligations) shall be finally settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Such arbitrations shall be held in Boston, Massachusetts, USA. The language of the arbitration shall be English and all arbitrators shall speak English fluently. All documents which are not in English shall be submitted with an English translation thereof. The decision of the arbitrators shall be final and binding and any court with proper jurisdiction shall be entitled to issue a decree enforcing the arbitral award.

## XIX. NOTICES

Any notices given hereunder shall be validly given if forwarded by registered mail or by telefax addressed to the party's address or telefax number appearing hereinafter unless such party has notified the other party of a substitute address or telefax number in writing:

| | |
|---|---|
| To COMPANY at: | 38 Everett Street<br>Boston, Massachusetts 02134 USA<br>Attn: President<br>TELEFAX: (617) 787-9355 |
| To Distributor at: | c/o Johaco Enterprise (H.K.) Ltd.<br>Room 1219<br>Chevalier Commercial Centre<br>No. 8 Wang Hoi Road<br>Kowloon Bay<br>Hong Kong<br>TELEFAX: 852-3051565 |

## XX. FAILURE TO ENFORCE

The failure of COMPANY to enforce at any time or for any period of time the provisions hereof in accordance with their terms will not be construed to be a waiver of such provisions or of the right of COMPANY thereafter to enforce each and every such provision.

## XXI. ENTIRE AGREEMENT - MODIFICATIONS

This Agreement supersedes all prior agreements, oral or written, between the parties hereto and contains the entire and only agreement between the parties respecting the sale and the purchase, the distribution and servicing by Distributor of any Products, and any representation, terms or conditions relating thereto or in connection therewith, oral or in

16

writing, not incorporated herein will not be binding upon either party. No modification, termination, notice of termination or discharge of this Agreement or any of the provisions hereof nor any representation, promise or condition relating to this Agreement will be binding unless made in writing.

## XXII. ASSIGNABILITY

This Agreement is binding upon the parties hereto and their respective successors in interest, but shall not be assignable by Distributor without COMPANY's written consent.

## XXIII.    INVALID PROVISIONS

Except as otherwise provided in Section VII.4 hereof, should any provision of this Agreement now or later conflict with any applicable law or administrative regulation with the force of law, whether national or supranational, said provision(s) shall be considered as not written and of no effect and all other provisions of this Agreement shall remain in full force and effect.

IN WITNESS WHEREOF the parties have accepted, agreed and executed this Agreement in four (4) originals as of the 1st day of January, 1995.

NEW BALANCE ATHLETIC SHOE, INC.

By:

Title:

HAIKU JOHACO ENTERPRISE CO., LTD.

By:

Title:

17

# ANNEX A

## THE TERRITORY

Peoples Republic of China

# ANNEX B

## STANDARD CONDITIONS OF PAYMENT

Letter of Credit or cash in advance

# ANNEX C

## TRADEMARKS, TRADENAMES AND LOGOS

New Balance
NB
N

116004.c1
10/6/94

## LICENSE AGREEMENT

AGREEMENT made as of the 1st day of January, 1995 by and between NEW

BALANCE ATHLETIC SHOE, INC. (hereinafter referred to as "New Balance") and

HAIKU JOHACO ENTERPRISE CO., LTD. (hereinafter referred to as "Licensee").

WHEREAS, New Balance is the owner of the entire right, title and interest in the

Trademarks (as hereinafter defined);

WHEREAS, New Balance is in possession of valuable know-how relating to certain

techniques and methods of manufacture, merchandising and marketing relating to the

Products (as hereinafter defined);

WHEREAS, Licensee desires to arrange for the manufacture of Products by

Authorized Suppliers (as hereinafter defined) in the Manufacturing Territory (as hereinafter

defined) for sale in the Territory (as hereinafter defined); and

WHEREAS, New Balance has agreed to permit Licensee to arrange for the

manufacture of Products by Authorized Suppliers and to give to Licensee the right to use the

Trademarks in relation thereto on the terms and conditions hereinafter appearing.

NOW THEREFORE, in consideration of the mutual covenants and agreements

hereinafter set forth, the parties hereby agree as follows:

1.      Definitions.

For purposes of this Agreement, the following definitions shall apply:

(a)     "Affiliated Company" and Affiliated Companies" shall mean any legal

entity controlled directly or indirectly to the extent of a holding of at least fifty (50%)

percent of the voting stock or share capital of such entity by either of the parties or under

such common control with one of them.

(b)     "<u>Authorized Suppliers</u>" shall mean those companies which manufacture Products pursuant to a Supply Agreement with New Balance.

(c)     "<u>Competing products</u>" shall have the meaning set forth in Section 5(g) of this Agreement.

(d)     "<u>Manufacturing Territory</u>" shall mean Peoples Republic of China.

(e)     "<u>Products</u>" shall mean footwear which is manufactured by an Authorized Supplier pursuant to a Supply Agreement or sold in whole or in any part with use of any Technical Information or Trademarks.

(f)     "<u>Supply Agreement</u>" shall mean an agreement between New Balance and an Authorized Supplier for the manufacturing and packaging in the Manufacturing Territory of Products for resale.

(g)     "<u>Technical Information</u>" shall include, but not be limited to, all New Balance know-how, materials, production methods and techniques, formulae, specifications, directions and standards for manufacturing and packaging and all commercial and marketing information applicable to the Products and all subsequent modifications, improvements and additions thereto.

(h)     "<u>term</u>" shall mean the initial term and any extended term as provided in Section 6, unless the context otherwise requires.

(i)     "<u>Territory</u>" shall mean Peoples Republic of China.

(j)     "<u>Trademarks</u>" shall mean the following trademarks, trade names and logos in the Territory:

| Trademark | PRC Registration No. | Class |
|-----------|---------------------|-------|
| New Balance | 175.153 | 54 |
| NB Logo | 175,152 | 54 |
| N | 175,151 | 54 |

"Trademarks" shall also mean any further trademarks, trade names or logos, or registrations or applications for registration relating thereto, as may be agreed to in writing between the parties hereto or otherwise included pursuant to the terms hereinafter provided.

2. Manufacturing and Trademark License.

(a) Subject to the terms and conditions hereinafter contained, New Balance hereby grants to Licensee during the term of this Agreement (i) a non-exclusive license to use the Technical Information and Trademarks to arrange for the manufacturing and packaging of the Products in the Manufacturing Territory by Authorized Suppliers strictly in accordance with this Agreement and (ii) an exclusive license to distribute and sell the Products under the Trademarks in the Territory (hereinafter collectively called the "license"). The license is granted only for the Manufacturing Territory and the Territory as respectively indicated above and specifically excludes any right by Licensee to itself manufacture or assemble the Products or any right to manufacture, assemble, distribute or sell any Products or other items in or to any parties located in any other country or to assist or procure the manufacturing, distribution, use or sale of the Products outside the Manufacturing Territory or the Territory as respectively indicated above or to arrange for the manufacturing and packaging of Products by any third party other than an Authorized Supplier. Licensee shall not distribute or sell the Products to any person or entity which Licensee knows or should know will distribute or sell such Products outside the Territory.

3

(b)    Nothing contained in this Section 2 or in this Agreement shall prevent
New Balance from (1) using or granting others the right or license to use the Trademarks in
connection with the distribution and sale of Products in any area of the world other than the
Territory or in connection with the distribution and sale of goods (other than the Products) of
all other types and descriptions in any area of the world, including the Territory; (2) using or
granting others the right or license to use the Trademarks in connection with the
manufacturing of goods of all types and descriptions (including the Products) in any area of
the world, including the Manufacturing Territory and the Territory; or (3) producing or
having produced limited quantities of the Products to be used in the Territory specifically for
promotional and advertising purposes and not for sale, and New Balance shall have no
liability for breach of this Agreement in connection with the foregoing or the acts of such
licensees.  New Balance expressly disclaims any representation, covenant or warranty that
Products shall not be sold in the Territory by any such licensee or other third party.


3.    Manufacturing and Packaging.

(a)    Products shall be manufactured and packaged from such materials and
using such production methods and techniques as New Balance shall specify.

(b) New Balance shall from time to time provide Licensee with a list of
Authorized Suppliers to whom Licensee may submit purchase orders for the manufacturing
and packaging of Products pursuant to this license.  Each such purchase order shall constitute
an agreement between Licensee and Authorized Supplier for the manufacturing, packaging
and delivery of Products in accordance with the terms and conditions contained therein.
Licensee shall not submit purchase orders to entities which are not on the list of Authorized

4

Suppliers most recently received from New Balance without New Balance's prior written approval, which approval New Balance may grant or withhold in its sole discretion. New Balance expressly reserves the right to terminate any Authorized Supplier and upon receipt of notice of such termination, Licensee shall thereafter cease submitting purchase orders to such supplier. Licensee agrees that all purchase orders to be submitted by Licensee to Authorized Suppliers for the manufacturing and packaging of Products pursuant to this license shall be subject to New Balance's prior written approval, which approval New Balance may grant or withhold in its sole discretion.

(c) Licensee recognizes the importance to both parties of high standards of quality in relation to the Products manufactured by Authorized Suppliers under this license. Licensee therefore undertakes and agrees that all Products manufactured and packaged by Authorized Suppliers pursuant to the license shall conform in all respects with the formulae, specifications, directions and standards for manufacturing and packaging communicated by New Balance in written, graphic or oral form at the time New Balance approves the purchase order and shall withdraw from the market any Products which do not so conform. Licensee acknowledges and agrees that as part of its obligations under this Agreement, Licensee shall at all times deal in good faith with Authorized Suppliers and shall comply with all terms and conditions contained in purchase orders submitted to Authorized Suppliers, including without limitation, timely payment of the purchase price of the Products. New Balance shall have no liability whatsoever to either Licensee or any Authorized Supplier for the other party's failure to comply with the terms and conditions of such purchase orders or for any other actions or failures to act by such party.

(d)    Licensee shall at its cost immediately take out adequate insurance to cover itself and New Balance (and its Affiliated Companies) against third party claims for death, injury and/or damage to property resulting from the use of any Product. Such insurance shall remain in effect during the entire term of this Agreement and Licensee shall promptly furnish proof of same to New Balance on request.

4.    Confidentiality.

(a)    Licensee acknowledges that all Technical Information furnished by New Balance and/or its Affiliated Companies to Licensee during the term of this Agreement is proprietary to New Balance and is of a highly confidential and secret nature.

(b)    All of such Technical Information is given and received in strict confidence and is to be used by Licensee solely for the purpose of carrying out this Agreement. Licensee shall keep in strict confidence the aforesaid Technical Information and shall not, for any reason whatsoever, reveal, disclose, sell or transfer any part of such Technical Information, directly or indirectly, to any third party except as permitted by the terms of this Agreement.

5.    Trademark and Other Industrial Property Rights.

(a)    Licensee acknowledges that New Balance is the owner of the entire right, title and interest in the Trademarks. Licensee agrees not to challenge or contest such ownership or the validity of the Trademarks in any country. Licensee further acknowledges that Licensee shall acquire no rights to or interest in the Trademarks or any other industrial property rights of New Balance or its Affiliated Companies by reason of this Agreement or otherwise and that the Trademarks shall be used by Licensee solely in connection with

6

arranging for manufacturing and packaging and with distributing, advertising and selling the Products in the manner provided by this Agreement.

(b)    If legally required, Licensee and New Balance shall execute an appropriate form of license agreement for recording and any amendments to such agreement.

(c)    Neither Licensee nor its Affiliated Company shall, in any country during the term of this Agreement or at any time thereafter, apply for or seek registration of any words, trade marks, trade names or logos which are the same as or confusingly similar to any of the Trademarks or which may in any manner be used in unfair competition therewith. Licensee further undertakes and agrees that it will not at any time do, or so far as it is able, allow to be done, any act or thing which may in any way diminish, dilute or adversely affect the reputation of any of the Trademarks and that it will not represent in any way that it has any other rights to or interest in any of the Trademarks other than the rights as expressly licensed by New Balance hereunder.

(d)    Neither Licensee nor any Affiliated Company shall either during the term of this Agreement or at any time thereafter manufacture, process, package, distribute or sell products on its own behalf or for others, which in any way will simulate the dress and design of any products of New Balance or its Affiliated Companies, including the Products.

(e)    All markings, formats, layouts, designs and logos of the Products shall be subject to the prior approval of New Balance. Any new marks, logos, layouts, designs and the like shall be used only with the prior written approval of New Balance and registration therefor will be the sole and exclusive right and property of New Balance, unless prohibited by law, in which case New Balance shall have a perpetual royalty-free non-exclusive license to use the same. It is nevertheless understood and agreed by the parties

7

hereto that Licensee shall at all times during the term hereof have the right in its sole

discretion, but always in accordance with all the terms and conditions herein contained, to

affix its own trademarks and/or trade names to the Products and/or the packing thereof and

any commercial documents and advertising materials issued by Licensee in connection

therewith, and nothing contained in this Agreement shall be deemed, interpreted or construed

to otherwise restrict such right of Licensee.  Notwithstanding the above, Licensee agrees not

to use, without New Balance's prior written consent, any of the Trademarks or any other

trademarks, trade names, designs, logos or other industrial property rights of New Balance

or its Affiliated Companies in combination or association with trademarks, trade names,

logos, designs or industrial property rights owned by Licensee or any other third party.  All

rights and registrations of any such trademark, trade name, logo, design or other industrial

property right produced by any such combination or association shall belong to New Balance,

unless prohibited by law, in which case New Balance shall have a perpetual royalty-free non-

exclusive license to use the same.

(f)     If any case of unfair competition or infringement by third parties in the

Manufacturing Territory or the Territory of the Technical Information, Trademarks,

registered formats, layouts, designs and logos or any other industrial or other property rights

of New Balance or its Affiliated Companies comes to the knowledge of Licensee, it shall

promptly and fully advise New Balance.  New Balance shall in its discretion decide whether

it will prosecute any such case of which it is so notified.

(g)     (i)     Licensee agrees, during the term of this Agreement and for a period of

one year after its termination, expiration or non-renewal for any reason

whatsoever, not to manufacture, sell, distribute or otherwise handle in

8

the Manufacturing Territory or the Territory any Competing products. "Competing products" shall mean any products which are not manufactured and/or sold in whole or in any part with use of any Technical Information or Trademarks and which are similar to the Products or which can be put to identical or similar uses or which might compete with or hinder the sale of the Products.

(ii) Licensee agrees, during the term of this Agreement and for a period of one year after its termination, expiration or non-renewal for any reason whatsoever, that it will not, without New Balance's prior written consent, facilitate, directly or indirectly, the distribution and/or sale of any Competing products or to hold or acquire, directly or indirectly, any participation in any organization or entity selling, distributing or otherwise handling Competing products. Non-compliance by Licensee with the provisions of this Section 5(g) during the term hereof shall be good cause for New Balance to terminate this Agreement pursuant to Section 10(a)(1).

(iii) In the event that this Section 5(g) or any portion thereof shall be held by a court, administrative body or governmental agency of competent jurisdiction to be invalid, it is expressly understood and agreed that as to such jurisdiction the foregoing restrictions set forth in this Section 5(g) shall be automatically considered modified to embrace the greatest possible time and area of restriction then permitted under applicable law, and such invalidity, illegality or unenforceability of this Section 5(g) or

9

any portion thereof shall not impair the enforceability of these restrictions as so modified nor in any manner otherwise affect the remaining provisions of this Agreement.

6.    Term of Agreement.

(a) Subject to the exceptions elsewhere set forth herein, this Agreement shall run for a term of one (1) year commencing on the date hereof and terminating on the first anniversary of the date hereof, at which time, if either party notifies the other in writing at least ninety (90) days before the end of said period of its intention to let this Agreement expire at the end of said period, it shall automatically expire.

(b) If neither party sends the notice indicated in Section 6(a) above, this Agreement shall be automatically renewed, at the end of the aforesaid period provided in Section 6(a), for further successive one-year periods, provided, however, that in the event of such renewal(s) either party can then, in its sole discretion, with or without cause, and without the payment of any termination indemnities or similar payments, terminate this Agreement effective as of the end of any one-year renewal period by written notice to the other party sent at any time prior to ninety (90) days before the end of such one-year renewal period.

7.    Payments.

(a)    In consideration of the license granted hereunder, Licensee undertakes to pay to New Balance a royalty in the amount equal to ~~six (6%)~~ three(3%) percent of the "net selling price" of all Products sold by Licensee. Royalties payable under this Section shall be calculated and paid in accordance with the provisions hereinafter contained. The royalty rate shall be renegotiated after the third anniversary of the agreement.

10

(b)     Within forty-five (45) days of each 31st March, 30th June, 30th September and s December, Licensee shall render to New Balance an authenticated written statement in English certified by Licensee's chief financial officer showing the aggregate of the net selling prices and number of units of the Products sold by Licensee as aforesaid during the three (3) months ended on such date broken down by each Product; and the amount of the royalty due to New Balance in respect thereof.  The royalty payment due shall accompany such report.

(c)     For the purpose of this Section:

(i)     The Products shall be deemed to have been sold upon the earlier of the dispatch of the invoice to the purchaser or the delivery of the Products to the purchaser.

(ii)     The "net selling price" means the gross selling price as invoiced by Licensee (after deduction of bona fide trade discounts and sales taxes, if any) less only accepted returns from purchasers of the Products and damaged Products for which credit is given to purchasers.

(d)     Licensee shall during the continuance of this Agreement keep at its usual place of business true and particular accounts and records of the Products sold by Licensee and of the amount of all royalties paid or payable hereunder.

(e)     The duly authorized representatives of New Balance shall have the right at any reasonable time during business hours to inspect and audit the accounts and records of Licensee relating to the sale and/or disposal of the Products and of the invoice price and all other matters directly or indirectly relevant to the calculation of the amount of royalty due and such representatives shall be entitled to take copies of or extracts from any such records.

(f)    Royalty payments made hereunder shall be made in U.S. Dollars at the official rate of exchange prevailing at the bank where Licensee maintains its principal account in the Territory on the date when payment is due to New Balance at its office at 38 Everett Street, Boston, Massachusetts 02134, United States of America, provided that, if payment is overdue and if the official rate of exchange prevailing at such bank on the date when payment is actually made to New Balance exceeds the rate prevailing on the date when such payment is due, then such payment shall be made at such higher rate. In the event of Licensee's being unable to effect any payment due hereunder in accordance with this Agreement by reason of any refusal of any government to permit such payment under applicable exchange control regulations or by reason of any other government order or control, Licensee shall not be relieved of its obligation to make such payment but New Balance shall not be entitled to exercise any right of termination hereunder by reason of delay or failure to make the payment provided that:

(1)    Licensee uses every reasonable endeavor to obtain permission to make said payment, and

(2)    Licensee shall effect payment in any permitted manner required by New Balance.

(g)    The parties recognize that if any government imposes a withholding tax, on royalties, Licensee shall be entitled to deduct therefrom the applicable withholding tax provided that (i) such tax is in fact remitted to such government, and (ii) Licensee submits to New Balance evidence of such payment.

(h)    Licensee shall in no event, without New Balance's prior written authorization, be entitled to set off any amounts it may claim are owed to it by New Balance

12

or any Affiliated Company for any reason whatsoever, against any amounts owed to New Balance pursuant to this Section 7.

(i)    All late payments shall bear interest at a rate of two (2%) percent per month or, if such rate should exceed any applicable permissible legal interest rate, then at the highest legally permissible rate. The operation of this Section is without prejudice to any other right or remedy New Balance may have under law or pursuant to the terms of this Agreement.

(j) In addition to the royalties payable to New Balance under this Section 7, Licensee undertakes to pay to New Balance Athletic Shoes (Far East) Limited ("NBFE"), during the term of this Agreement, a commission and additional charges for services rendered by NBFE with respect to inspections, product development and monitoring Licensee's compliance with the terms and conditions of this Agreement. The amounts and other terms of such payments shall be in accordance with NBFE's standard terms and conditions.

8.    Advertising.

(a)    Licensee shall express and identify properly in all advertising and promotion that the Products are "Made under License from New Balance Athletic Shoe, Inc." or any such other statement or notice identifying the Products as having been manufactured, packaged, distributed and sold under license from New Balance.

(b)    Licensee shall not engage in, publish, cause to be published, encourage or approve any advertisement or practice which might mislead or deceive the public or might be detrimental to the good name, trademarks, trade names, goodwill or reputation of New Balance or any of its Affiliated Companies or the Products.

(c)     Licensee agrees to consider the advice and suggestions of New Balance with respect to Product advertising and promotion.  Licensee further agrees, upon request, to promptly discontinue any advertising or practice reasonably deemed by New Balance to have a detrimental effect as aforesaid.  Licensee shall not advertise the Products outside the Territory.

(d)     Licensee shall at all times respect, normal commercial practices and the rules of fair competition in each country of the Territory.  It shall engage in no practices which could be detrimental or embarrassing to New Balance and/or to its Affiliated Companies.

9.     Reports.

As one of its material obligations hereunder, Licensee will submit to New Balance within fifteen (15) days of the end of each calendar month, the following information for such calendar month:

(i)     A statement of the inventory at the beginning and at the end of each calendar month of each finished item of the Products manufactured by Authorized Suppliers pursuant to Licensee's purchase orders during such calendar month; and

(ii)     A statement of the sales of the Products invoiced during each calendar month by Licensee, including the quantities and price of each item sold.

10.    Termination.

(a)    Notwithstanding any other provisions of this Agreement, this Agreement may be terminated before the expiration of its term without payment by New Balance of any indemnity or other sums on account of such termination under the following circumstances:

(1)    by New Balance (i) in the event of Licensee's failure to fulfill any of its obligations under this Agreement or of a violation of or default under the terms of this Agreement, (ii) if a change occurs in the control of Licensee (whether such change is in direct or indirect control), (iii) if a change or disruption occurs in Licensee's management, commercial or financial situation including without limitation planned dissolution or liquidation, merger, consolidation or acquisition (which change or disruption has had or might in the future have, in New Balance's reasonable judgment, a substantial adverse effect on the performance by Licensee of its obligations under this Agreement) or the death, incapacity to perform his duties of employment for a continuous period of ninety (90) days or the termination of his employment or management relation with Licensee of the person signing this Agreement on behalf of Licensee (in relation herewith, Licensee undertakes and agrees to notify New Balance of any such change as soon as it occurs or as soon as it is likely to occur), or (iv) if Licensee is in a state of cessation of payments when due in their normal course, if any action involving bankruptcy, rights of creditors or insolvency is brought concerning Licensee or if Licensee makes an assignment for the benefit of creditors or if a court-appointed person is designated to operate the Licensee or if a referee in bankruptcy or similar official is named;

(2)    upon termination of the distribution agreement or any other license agreement between New Balance and Licensee for any reason whatsoever; or

(3)    by mutual consent of the parties hereto.

(b)    Termination of this Agreement as provided for in this Section 10 shall be by written notice and shall be effective upon receipt, except in the case of Sections 10(a)(1)(iv) or 10(a)(2) in which case the termination is automatic (without notice) upon the occurrence of the event.

(c)    Upon termination of this Agreement for whatever reason (and subject to the applicable provisions of a distribution agreement or other license agreement between New Balance and Licensee which survive the termination hereof), Licensee shall immediately remove from its premises and elsewhere all signs and advertising relating to New Balance and the Products, and Licensee shall immediately cease and thereafter Licensee and all Affiliated Companies shall forever refrain from using in any manner (i) the Trademarks and all other trademarks and trade names of New Balance and/or its Affiliated Companies identified with or used on or in connection with the Products (or any words, marks, trade names or logos which are confusingly similar thereto) and (ii) the Technical Information made available under this Agreement.

(d)    In the event any court, arbitration panel or other governmental authority or public body shall hold any part of Section 10(c) invalid or unenforceable, Licensee hereby undertakes and agrees to pay to New Balance a royalty equal to one hundred fifty (150%) percent of the royalty provided for in Section 7(a) above in consideration for the continued use of such Technical Information and/or Trademarks and any such invalidity, illegality or

**16**

unenforceability of Section 10(c) or any portion thereof shall not impair the enforceability of the provisions as modified pursuant to this Section 10(d), nor in any manner otherwise affect the remaining provisions of this Agreement.  Such royalty shall be paid in the same manner as set forth in Section 7 hereof and all rights granted to New Balance herein in connection with royalty payments shall apply thereto.

(e)    Upon termination of this Agreement for whatever reason (and except in the event of the application of Section 10(d) above), Licensee will promptly deliver to New Balance or to a person, firm or corporation designated in writing by New Balance, all records, manuals, technical data, drawings and other documents, and any copies thereof, which relate in any way to the formulae, specifications, manufacturing processes, standards, Technical Information or other information obtained by Licensee under this Agreement.

(f)    It is understood by the parties hereto that in the event of termination of this Agreement for whatever reason, New Balance shall have no obligation whatsoever to reimburse or otherwise compensate Licensee in whole or in part, for Licensee's capital or labor investment undertaken in connection with the manufacture, storage, distribution or sale of the Products, or to compensate or indemnify Licensee in any other way whatsoever, including without limitation on account of the loss of prospective profits on anticipated sales or commitments in connection with the business or goodwill of Licensee.

(g)    The termination or expiration of this Agreement shall not relieve Licensee of any liability for any monies due to New Balance or any of its Affiliated Companies at the time of such termination or expiration nor shall it relieve Licensee of the post-termination obligations imposed by this Agreement.  At no time during the term of this Agreement or at or after its termination shall Licensee have the right, for any reason

**17**

whatsoever, to withhold any payments due hereunder to New Balance or to set off against any such payments any amounts which Licensee claims are owed to it by New Balance or any Affiliated Company of New Balance.

(h)     Within thirty (30) days of the effective date of such termination or expiration of this Agreement, Licensee shall submit to New Balance an inventory list of all unsold Products and all unfinished Products as of the date of said termination or expiration. New Balance may in its discretion in all cases (but shall in no case have any obligation to) purchase or cause an Affiliated Company to purchase all or any part of such inventory by notifying Licensee in writing. The price for any such inventory so purchased shall be Licensee's actual manufacturing cost (excluding overhead, shipping, insurance, customs and similar costs). In the event that this Agreement is terminated by New Balance because of breach by Licensee of any of its obligations under this Agreement or, in the event that this Agreement expires or is terminated for any reason other than material breach by New Balance of its obligations hereunder, then the transportation and packing costs for any Products purchased by New Balance as provided above shall be paid by the Licensee. Licensee shall in any event return to New Balance and its Affiliated Companies, free of charge, all Products, materials and equipment which New Balance or its Affiliated Companies made available, free of charge, to Licensee.

In the event that New Balance or its Affiliated Companies should not purchase or should repurchase only part of the inventory mentioned in the preceding paragraph, Licensee shall have the right, for a period of ninety (90) days after the effective date of termination of this Agreement, under the terms and conditions hereof, to sell the said inventory or that part of the inventory not purchased, it being understood and agreed by

Licensee that all such sales shall be made pursuant to the normal conditions and terms of sale (including prices) theretofore practiced by Licensee and that Licensee shall pay to New Balance the royalty required under Section 7 hereof with respect to such sales.

11.    Miscellaneous.

(a)    This Agreement is binding upon the parties hereto and their respective successors in interest, but with respect to Licensee, this Agreement and the license granted hereunder is nondivisible, nontransferable, and nonassignable, and without the right to grant sublicenses or subcontracts. New Balance shall have the right, by written notice to Licensee, to assign its rights and/or obligations hereunder to an Affiliated Company, to a purchaser of its business, or to any entity which succeeds to the interest of New Balance in the Trademarks in the Manufacturing Territory and/or the Territory and shall have the right to nominate any other person, company or corporation to receive royalty income or to undertake the obligations of New Balance under the terms of this Agreement whether or not this Agreement is so assigned.

(b)    The failure of either party to enforce at any time or for any period of time the provisions hereof in accordance with their terms will not be construed to be a waiver of such provisions or of the right of such party thereafter to enforce each and every such provision.

(c)    This Agreement shall be deemed to have been entered into in the Commonwealth of Massachusetts, U.S.A. and shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, U.S.A. without giving effect to principles of conflicts of law. This Agreement has been executed in the English

19

language and any interpretation or construction of this Agreement shall be based solely on the English language official text.

(d)    This Agreement supersedes all prior agreements, oral or written, between the parties hereto relating to the subject matter covered herein and sets forth the entire agreement and understanding between the parties as to the subject matter of this Agreement, and neither of the parties shall be bound by any conditions, definitions, warranties, or representations with respect to the subject matter of this Agreement, other than as expressly provided in this Agreement or as duly set forth on or subsequent to the date hereof in writing and signed by a proper and duly authorized representative of the party to be bound thereby.

(e)    All notices, requests, demands and other communications shall be validly given if forwarded by registered mail or by telefax addressed to the party's address or telefax number appearing hereinafter unless such party has notified the other party of a substitute address or telefax number in writing:

To New Balance at:
38 Everett Street
Boston, Massachusetts 02134

Attn: President
Telefax: (617) 787-9355

To Licensee at:

c/o Johaco Enterprise (H.K.) Ltd.
Room 1219
Chevalier Commercial Centre
No. 8 Wang Hoi Road
Kowloon Bay, Hong Kong

Telefax: 852-3051565

20

(f)    Licensee shall act hereunder in all respects as an independent contractor and it shall do business at its own risk and for its own profit and nothing contained in this Agreement shall constitute a partnership or agency relationship between Licensee and New Balance nor authorize Licensee to make any representation on behalf of or in any way to bind New Balance to any obligation of any kind, express or implied, to any third party unless specifically authorized to do so in writing by New Balance and in accordance with the conditions specified by New Balance or to incur any liability on behalf of New Balance.

(g)    If a condition of this Agreement is that it must be approved by, or recorded with, the government of a country or agency thereof then this Agreement shall not become effective with respect to such country until such approval is received. Licensee shall have the sole responsibility, at its sole expense, for applying for such approval and for effecting any other filings required in connection with this Agreement at Licensee's full cost and New Balance shall cooperate to the extent necessary. Licensee shall keep New Balance fully informed of all steps taken by it in connection with any such approval and promptly provide New Balance with copies of any documents submitted in connection therewith.

(h)    Neither party shall under any circumstances be liable for any claim whatsoever or however arising of the other party hereto nor any of its customers or any other third party due to such party's failure of or any delay in performance of any of its obligations arising in connection with this Agreement if the performance of such obligation is prevented, restricted or materially interfered with as a result of any acts, causes or circumstances beyond the reasonable control of such party so affected, including without limitation, acts of God, acts or omissions of any other entity or person, fire, flood, strike or labor dispute of any kind, embargo, war, riot, insurrection or civil or military authority.   ..

21

(i)     The parties agree that any and all disputes related to or stemming from this Agreement, its application and/or termination (including post-termination obligations) shall be finally settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Such arbitrations shall be held in Boston, Massachusetts U.S.A. The language of the arbitration shall be English and all arbitrators shall speak English fluently. All documents which are not in English shall be submitted with an English translation thereof. The decision of the arbitrators shall be final and binding and any court with proper jurisdiction shall be entitled to issue a decree enforcing the arbitral award.

(j)     Except as otherwise provided in Section 10(d) hereof, should any provision of this Agreement now or later conflict with any applicable law or administrative regulation with the force of law, whether national or supranational, said provision(s) shall be considered as not written and of no effect and all other provisions of this Agreement shall remain in full force and effect.

(k)     The titles of the Sections of this Agreement are for convenience only and shall not be considered as being part of this Agreement and are of no legal effect

(l)     Each party represents and warrants to the other that it has full power and authority to enter into this Agreement and to perform its obligations hereunder, including, if necessary, having received authority from its Board of Directors.

(m)     Licensee agrees to fully indemnify and hold New Balance and Affiliated Companies of New Balance harmless against all costs, damages and expenses arising in connection with any breach by Licensee of any of its obligations hereunder.

(n)    The parties agree to cooperate in order to file any requests for authorization or notification to the appropriate governmental authorities as counsel to either party may deem advisable.

(o)    The parties agree to cooperate with each other to the fullest possible extent with respect to all aspects of their rights and obligations under this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed these presents as of the date and year first written.

NEW BALANCE ATHLETIC SHOE, INC.

By:_____

Its_____

HAIKU JOHACO ENTERPRISE CO., LTD.

By:_____

Its___ _____

116707.c1
10/7/94

23



COMPANIES ORDINANCE
(CHAPTER 32)
公 司 條 例
(第三十二章)

CERTIFICATE OF INCORPORATION
ON CHANGE OF NAME
公 司 更 改 名 稱
註 冊 證 書

I hereby certify that
本 人 證 明 證 明

JORACO ENTERPRISE (H.K.) LIMITED
承宏貿易 (香港) 有限公司

having by special resolution changed its name, is now incorporated under
the name of

YUNTEX ENTERPRISE (HK) LIMITED
(揚田實業 (香港) 有限公司)

Issued by the undersigned on    31 October 1997,

MISS H. CHANG

for Registrar of Companies
Hong Kong
香港公司註冊處處長
(公司註冊主任    張巧美    代行)

# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
## International Arbitration Tribunal

In the Matter of the Arbitration between:

Re: 50 133 T 00057 03
New Balance Athletic Shoe, Inc.
vs
Yuntex Enterprise (HK) Limited
and
Horace Chang

## FINAL AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreements dated January 1, 1995, by which the above-named parties are bound, having been duly sworn, based upon the findings of fact, rulings of law, and conclusions set forth in my Second Partial Award, which are incorporated and made part of this Final Award by reference, and having considered the parties' subsequent submissions on the allocation of the costs of the arbitration, do hereby, AWARD, as follows:

1. The Respondents are ordered to cease making any use of, and to return to the Claimant, forthwith, any and all items of the Claimant's property in their possession, including, without limitation, New Balance signs, labels, packages, wrappers, advertisements, footwear molds and technical, sales, marketing and other confidential business materials relating to formulae, specifications, manufacturing processes, standards, and technical information.

2. The respondents shall, jointly or severally, pay the Claimant damages in the amount of SIX MILLION NINE HUNDRED TWENTY FOUR THOUSAND AND FIVE HUNDRED ($6,924,500.00) DOLLARS and interest in the amount of TWO MILLION NINE HUNDRED FIFTY FIVE THOUSAND ONE HUNDRED TWENTY-FOUR DOLLARS AND EIGHTY CENTS ($2,955,124.80), all in US currency.

3. The compensation and expenses of the arbitrator totaling FOURTY THOUSAND SIX HUNDRED THIRTY SEVEN DOLLARS AND ELEVEN CENTS ($40,637.11) shall be borne in the following proportions: 20/% by Claimant and 80% jointly and severally by Respondents. Therefore, Respondents shall pay to Claimant, jointly or severally, the sum of TWENTY THOUSAND SEVEN HUNDRED TWELVE DOLLARS AND FOURTY TWO CENTS $20,712.42 for that portion of compensation previously advanced to the International Centre for Dispute Resolution ("ICDR") AND Respondents shall pay to the ICDR, jointly or severally, the sum of ELEVEN THOUSAND SEVEN HUNDRED NINETY SEVEN DOLLARS AND TWENTY SEVEN CENTS $11,797.27 for compensation still due the arbitrator.

4.  The administrative fees and expenses of the ICDR totaling $11,075.00 shall be borne in the following proportions: 20/% by Claimant and 80% jointly and severally by Respondents. Therefore, Respondents shall pay to Claimant, jointly or severally, the sum of EIGHT THOUSAND EIGHT HUNDRED SIXTY DOLLARS $8,860.00 for that portion of its share administrative fees and expenses previously advanced by Claimant to the ICDR.

This Final Award is in full settlement of all claims/ and counterclaims submitted to this Arbitration. The arbitrator will retain jurisdiction until January 22, 2005, to clarify this Final Award, if necessary.

I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Boston, Massachusetts, USA.

December 22, 2004
        Date                                    Natasha Lisman


State of Massachusetts
                            }  SS:
County of Suffolk

I, Natasha C. Lisman, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

December 22, 2004
        Date                                    Natasha Lisman


#357513

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

In the Matter of the Arbitration Between:                    50 T 133 00057 03

New Balance Athletic Shoe, Inc.
vs.
Yuntex Enterprise (HK) Limited,
and Horace Chang

**SECOND PARTIAL AWARD**
**And**
**PROCEDURAL ORDER**

### PROCEDURAL HISTORY

Based on the evidentiary hearing and the pre-hearing and post-hearing

submissions of the Claimant, New Balance Athletic Shoe, Inc. ("New Balance"), and the

Respondents, Yuntex Enterprise (HK) Limited ("Yuntex") and Horace Chang, I have

made my findings and conclusions as to the previously unresolved jurisdictional issue

and as to liability and remedies. This award is partial because, at the Claimant's request,

the issue of the allocation of arbitration costs has been put off until after the disposition of

liability and remedies.[1]

Both Yuntex and Mr. Chang raised jurisdictional objections from the outset and

throughout this proceeding, predicating them on the fact that neither was a signatory to

the two arbitration agreements upon which New Balance based its demand for this

arbitration. In my First Partial Award I ruled that Yuntex was bound by the arbitration

agreements because it was an alter ego of the signatory, Haikou Johaco Enterprise Ltd.

---

[1]     The Claimant also requested additional time to submit evidence of its attorney's fees. In view of
my conclusion on this issue, such submission will not be necessary.

("Haikou"), [2] and had expressly assumed Haikou's rights and obligations under the contracts containing the arbitration agreements. As to Mr. Chang, I ruled that while the evidence before me at the preliminary stage of the arbitration was insufficient to allow a conclusive finding, because much of the evidence bearing on his relationship to Haikou was likely to be in the Respondents' possession and control, I would reserve a decision on arbitral jurisdiction over Mr. Chang until after the completion of discovery.

In my Third Procedural Order I allowed New Balance to propound to the Respondents a specified number of interrogatories, document requests, and requests for admission of facts.[3] The Order expressly cautioned Respondents that failure to respond "to any request for admission of facts by either (i) admitting or denying its truth, or (ii) objecting to it, shall be deemed to be an admission," and that failure to respond to "any interrogatory or request for documents may be treated as a basis for adverse inferences."

The Third Procedural Order and New Balance's subsequent discovery requests were duly served on Respondents. However, neither of them ever responded or sought any relief from the Third Procedural Order. As the matter approached the final hearing, the Respondents requested postponement of the previously scheduled hearing date and an extension of time for their pre-hearing submission of documentary exhibits and briefs. In the exercise of discretion and abundance of fairness, I granted their request, thereby extending to them yet another opportunity to offer substantive evidence in support of their positions on jurisdiction and to mount a defense on the merits. In spite of having requested and obtained the extension, Respondents made no pre-hearing submission. New Balance submitted an extensive set of documentary exhibits and a brief.

---

[2]     This company's name is sometimes transliterated as "Haiku."

[3]     Neither Yuntex nor Mr. Chang requested any discovery.

2

At the hearing, both sides were represented by counsel, one firm representing New Balance and another appearing jointly on behalf Yuntex and Mr. Chang. New Balance offered additional exhibits and the testimony of two executives. Yuntex's and Mr. Chang's attorney cross-examined New Balance's witnesses, put in several documentary exhibits but called no witnesses. Both sides submitted post-hearing arguments of fact and law.

In making my findings of fact, I relied on the evidence in the record and reasonable inferences from the evidence. In addition, in accordance with my Third Procedural Order, I treated the Respondents' failure to respond to certain requests for admissions of fact as constructive admissions and drew adverse inferences from their failure to respond to certain interrogatories and document requests. At the same time, I sought to avoid treating the Respondents' failure to respond to discovery in a manner that would be tantamount to the imposition of discovery sanctions or a default award, because the rules prescribed by the arbitration agreements, the Commercial Arbitration Rules of the American Arbitration Association,[4] do not authorize discovery sanctions and, in Rule 31, expressly prohibit default awards.

Accordingly, I limited the effect of a failure to respond as a constructive admission or a basis for an adverse inference only to such requests to admit, interrogatories and document requests that were couched with sufficient specificity as to permit a fact finder to derive from failure to respond the existence of specific facts or the evidence and import of specific documents. Furthermore, I considered inferences and constructive admissions arising from the Respondents' failure to respond only in

---

[4]     I applied the AAA Commercial Arbitration Rules as amended and effective on July 1, 2002, i.e. in effect at the time New Balance made its demand for arbitration.

3

conjunction with, or to fill gaps in, actual evidence but did not take them into consideration if they were inconsistent with actual evidence in the record.

## FACTS

### 1.    The parties and their business relationship

New Balance, a Massachusetts corporation, is one of the world's leading makers of athletic footwear, which is sold in over 120 countries. New Balance owns and has registered in the United States and numerous other countries, including China, a number of trademarks, including the so-called "N Saddle Design," which is a stylized, capital block-letter "N" affixed to the saddle and other parts of a shoe. New Balance produces and sells its shoes through various arrangements, including contracts with manufacturers and distributors to whom it grants licenses to use its trademarks in manufacturing New Balance shoes and/or distributing them in designated territories.

Horace Chang[5] is a Taiwanese businessman who has been involved in manufacturing and trade, including the production and distribution of footwear, in Taiwan, Hong Kong, and the People's Republic of China ("China" or "PRC"). He has conducted his business activities through several entities, including Yuntex,[6] located in Hong Kong; Chen Feng Footwear Co., LTD ("Chen Feng"), located in Taiwan; and Union Sports Industrial (Yang Jiang) Co., LTD ("USI"), located in China. He is a graduate of Taipei Technical Institute, lived in Canada for many years, and, at the time of the events at issue, was in his late fifties. The correspondence between him and others in the record demonstrates that his command of the English language is sufficient to enable him to correctly understand and make himself understood in English.

---

[5]    Horace Chang's Chinese name is also transcribed as Zhang Guoyang.

[6]    Until late 1997, Yuntex was called Johaco Enterprise (H.K.) LTD.

4

As of 1994, New Balance had been having shoes manufactured in China for export to the United States and elsewhere, but had not yet begun selling shoes in China. In late 1994, Mr. Chang approached New Balance with a proposal to sell its shoes in China through Haikou, representing that it was an entity he had formed to conduct distribution in China under a license granted by the Chinese government. New Balance was already familiar with Mr. Chang, having successfully dealt with him for many years in connection with contracts under which Chen Feng and USI factories had made New Balance shoes for export. New Balance accepted Mr. Chang's proposal and, on January 1, 1995, New Balance and Haiku executed a License Agreement granting Haiku a non-exclusive license to use New Balance's technical information and trademarks to arrange for the manufacturing and distribution of New Balance footwear, and a Distribution Agreement appointing Haiku as New Balance's exclusive distributor in the territory of China.

Thereafter, USI proceeded to produce New Balance shoes both for export and for China's domestic market, where Haiku distributed them on the wholesale basis and through its own retail outfits. In 1998, at Mr. Chang's request, New Balance's designation of Haiku as its China distributor was transferred to Yuntex. By 1999, Yuntex controlled approximately 85% of all retail outfits in China where New Balance shoes were sold.

Throughout his dealings with New Balance executives, Mr. Chang conducted himself, and held himself out, as the sole owner of Yuntex, Chen Feng, and USI. He referred to a USI factory as "my factory" and " to Haiku as "my company" and never mentioned or brought into discussions any partners or other co-principals. While the

5

New Balance executives encountered other individuals working at the three companies and later at Haikou, in these individuals' interactions with Mr. Chang, they behaved, and he treated them, as his subordinates.

In addition, Mr. Chang treated Yuntex, Chen Feng, USI, and Haiku as parts of a unified business enterprise. He intermingled the companies in his periodic presentations of status reports and business plans to New Balance. He also used the companies' trademarks, physical facilities, personnel, letterhead and electronic communication facilities interchangeably and without regard to whether a particular matter or function formally related to one or another company. Thus, shoes made by USI bore a "CF" mark, which stood for Chen Feng; the License and Distribution Agreements between New Balance and Haikou provided that notices to Haikou be mailed to Yuntex[7] in Hong Kong; Mr. Chang's faxes and emails concerning distribution issues in China, formally Haikou's role, arrived at random from Chen Feng, Yuntex, and USI; as previously noted, in 1998, he instructed that New Balance re-issue the certificate of "sole authorized representative and agent of New Balance" in the name of "YUNTEX ENTERPRISE (H.K.) LTD instead of Haikou Johaco Enterprise Ltd."; and in 1999, a warehouse for use in Yuntex's distribution business was built on the premises of a USI factory.

Based on this evidence, and combining it with the constructive admissions and negative inferences arising from the Respondents' failure to respond to New Balance's specific discovery requests concerning the relationship between Mr. Chang and the companies and the relationship among them, I reiterate my prior finding that Yuntex was at all times an alter ego of Haikou and, from 1998 on, the successor to Haikou's rights and obligations under the License and Distribution Agreements. I further find that Mr.

---

[7]    Then still named Johaco.

6

Chang was an alter ego of Yuntex. The documents offered on behalf of Yuntex and Mr.

Chang by their counsel, which I accept as genuine even though they were not

authenticated by any witness, show only the formal status of Yuntex and Haikou as

separate legal entities but do not address, much less refute, the evidence that for all

practical purposes, Mr. Chang used these entities as parts of a single manufacturing and

trading operation under his exclusive control.

### 2.    The termination of the parties' relationship

In 1999, difficulties emerged between New Balance and Mr. Chang that

ultimately lead to a breakdown of their relationship. The difficulties began with New

Balance's discovery at two USI factories of ongoing production of a very large volume of

the so-called "classic" models of New Balance footwear, which were older models

appropriate for marketing as lower-end, casual fashion footwear, in contrast to New

Balance's newer, high-end and high performance athletic lines. This discovery caused

New Balance several concerns, the most relevant of which for present purposes were that

the volume of the production, which Mr. Chang reported was 450,000 pairs, was a

dramatic increase from the actual volume of sales achieved in China in prior years and

New Balance feared that it would vastly exceed the demand in that market, while, at the

same time, the "classic" models under production were appropriate only for China's

emerging market but not for New Balance's other markets, where it did not want to dilute

its athletic performance brand image.

These concerns grew when New Balance began to receive reports that "classic"

shoes bearing both New Balance's trademarks and USI's "CF" mark were appearing in

Japan and other countries. New Balance's first reaction was to see to it that a label be

7

affixed to each pair of USI-made "classic" shoes stating that they were for sale in China only. However, when even shoes bearing this label were spotted in markets outside of China, New Balance became concerned that there were leaks in Mr. Chang's distribution chain through which product intended only for China was being trans-shipped into other markets - a phenomenon known as "parallel import" (i.e. parallel to the authorized import).

New Balance asked Mr. Chang for help in identifying and stopping the points of leakage. However, he failed to provide New Balance information about his customers, dealers, and orders needed for that purpose and outright refused to work with New Balance to solve the parallel import problem.[8] In response, New Balance informed Mr. Chang that it would terminate the License and Distribution Agreements effective December 31, 1999 and formally confirmed the termination by written notice in August, 1999. While ending the parties' China distribution relationship, New Balance continued to use USI as a supplier of New Balance shoes for export. However, as a result of further developments described below, New Balance decided to cease all dealings with Mr. Chang and his companies and gradually let outstanding orders for USI production run out by late fall, 2000.

### 3.    **Post-termination events**

Following the termination of the License and Distribution Agreements, Yuntex retained possession of various New Balance assets it had been provided in connection with the agreements, including New Balance signs, labels, packages, wrappers and

---

[8]    In a letter to New Balance, Mr. Chang declared that he had "no time to care about parallel import from China," and concluded, "I own my own company ... and you have no power to order me to do so and so."

advertisements, which Yuntex continued to display in its retail stores, as well as footwear

molds and technical, sales, marketing and other confidential business materials relating to

formulae, specifications, manufacturing processes, standards, and technical information.

In addition, in the course of the year 2000, New Balance acquired information

that led it to conclude, and allege in this arbitration, that Mr. Chang and his companies

have engaged in two activities which New Balance deems wrongful:

(1)    Selling China-only "classic" models of New Balance shoes past April 30,

2000, which was the latest cut-off date by which Yuntex was contractually allowed to sell

off any remaining inventory intended for the China market, as well as continuing to make

such shoes and use New Balance trademarks, and

(2)    Manufacturing and selling in China and other markets "Henkee" brand

shoes, which were indistinguishable from the New Balance "classic" fashion models and

displayed a saddle design featuring a stylized capital "H" bearing some resemblance to a

reverse capital "N." It is for these activities, and the profits they allegedly yielded to the

Respondents, that New Balance seeks to recover in this arbitration.

### a.    Post-termination production and sale of New Balance shoes

The evidence requires different findings concerning New Balance's allegations of

post-termination production and post-termination sale of New Balance shoes.  The

evidence upon which New Balance relies is insufficient to support a finding that Mr.

Chang and any of his companies continued to make new "classic," China-only models

with New Balance trademarks after the termination of the License and Distribution

Agreements.  While investigators retained on behalf of New Balance reported finding

New Balance shoes in production at a USI factory in 2000, they did not identify the shoe

9

models and their investigation was conducted at a time when the particular factory was

still authorized to produce New Balance footwear for export. Furthermore, while another

investigation report did refer to 20,000 pairs as being "for the domestic market," those

were in storage and could well have been part of the 1999 overstock rather than newly

made product. Finally, none of New Balance's discovery requests help resolve the

doubts left by the evidence as to continuing post-termination production because on that

issue, the requests are not specific enough.

By contrast, on the issue of post-termination sale of New Balance shoes, the

evidence in support of New Balance's claim is clear and persuasive. In 2001, long after

the permissible post-termination sell-off period had ended, New Balance investigators

posing as buyers elicited offers of sale of New Balance shoes on two separate occasions.

On the first occasion, personnel at a USI facility, with Mr. Chang's knowledge and

permission, offered to sell the investigator 125,740 pairs of New Balance shoes; on the

other occasion, employees at a facility bearing both Yuntex and USI signs accepted the

investigator's order for 6,492 pairs of New Balance shoes.[9]

**b.    Manufacture and distribution of Henkee shoes**

That Yuntex manufactured and distributed Henkee shoes in China in 2000 was

admitted by Mr. Chang in a contemporaneous e-mail to New Balance and by Yuntex in

its marketing materials. While the onset and duration of this activity are not established

with precision, circumstantial evidence indicates that Yuntex's manufacture, distribution,

and sale of Henkee shoes were ongoing by January 1, 2000 and continued well beyond

---

[9]      The investigator also reported receiving a representation that more New Balance shoes could be
manufactured but I have disregarded this representation because it was made by a broker, not by a USI
employee.

the end of that year. An application to register the Henkee mark had been made in 1999 and New Balance obtained photographs of a store carrying Henkee shoes, along with New Balance shoes, in early 2000. Mr. Chang's email was sent in April 2000 and New Balance investigators found Henkee shoes available for sale at a USI facility in November 2001.

New Balance contends that the Henkee stylized "H" saddle design is confusingly similar to New Balance's "N" saddle design. New Balance's evidence did not include any market survey or focus group study showing actual consumer confusion. Based on my own comparison of photographs and actual samples of New Balance and Henkee shoes introduced by New Balance, I do not find the two saddle designs confusingly similar, particularly when viewed in the context of the entire shoe. Henkee shoes prominently displayed the full word "Henkee" in several places and each pair was sold with a hang tag clearly explaining that Yuntex had introduced the Henkee brand in order to fill a gap created by New Balance's decision to use its trade mark only on high tech sports shoes. The hang-tags puffed about Yuntex's experience as New Balance's authorized agent and claimed that Henkee shoes were of the same quality as New Balance shoes, but did not claim New Balance as their source of origin.

    **c.**   **Profits**

Having been frustrated in its efforts to obtain through discovery actual information and documents upon which to calculate the Respondents' profits, New Balance opted to estimate the profits with the help of an economic model. The model was developed and presented at the hearing by New Balance's Corporate Manager of Sourcing, Purchasing, and Logistics, Jim Sciabarrasi, testifying as an expert. I find Mr.

Sciabarrasi qualified to provide such expert testimony by virtue of his extensive experience in the industry and personal knowledge of prevailing prices, costs, and profit margins at different levels of product distribution. Further, I find him a very credible witness and his model a reasonable approach in view of the unavailability of the actual data. Since the unavailability is solely of Yuntex's and Mr. Chang's making, it is reasonable and fair to resolve against them any uncertainty inherent in the use of estimates instead of actual numbers.

Therefore, I accept Mr. Sciabarrasi estimate that, on the per unit (i.e. pair of shoes) basis, the profits realized from manufacturing, wholesale distribution, and retail sales for both New Balance and Henkee shoes added up to $12.59 per pair. However, I do not accept the total volume of shoes he estimated to calculate total profits. He did not and could not have derived the volume from his personal knowledge or industry data. New Balance's requests to admit do not address the volume of sales and thus do not give rise to any specific constructive admission on the subject. Likewise, its interrogatories and document requests were not couched in terms permitting any specific inference as to volumes of shoes to be drawn from Respondents' failure to respond to them. Thus, the volume of shoes Mr. Sciabarrasi plugged into his model was essentially an assumption and I find it both too speculative and in tension with what little relevant evidence is available.

Since the evidence of Respondents' continuing to manufacture China-only New Balance models after 1999 and any models after 2000 is insufficient, the only fair inference is that the New Balance shoes they sold after the termination of the License and Distribution Agreement were part of the overstock produced in 1999. By Mr. Chang's

12

documented admission, the total volume of that production was 450,000 pairs, of which 250,000 pairs was intended to be held at a Yuntex warehouse at a USI facility for the following year – the very same facility at which New Balance investigators were later offered New Balance shoes. Based on Yuntex' pre-termination actual sales record and sale projections, it is fair to estimate that it sold at most 50,000 pairs before the April 30, 2000 cut-off date, and the remaining 200,000 over some period thereafter.

With respect to the volume of Henkee shoes made in 2000, it is fair to hold Yuntex and Mr. Chang to his own mid-1999 production forecast for the year 2000 for New Balance's "classic" models – 350,000 pairs – and to infer that this was the volume that Yuntex replaced with the Henkee brand after New Balance's termination of Yuntex's License and Distribution Agreements. For the reasons explained in my Conclusions, I find it unnecessary to determine whether Yuntex produced any Henkee shoes after 2000, or when the 350,000 pairs made in 2000 were sold.

Thus, while accepting Mr. Sciabarrasi's model and data on the per pair of shoes basis, to arrive at total profits, I multiplied his per-pair estimate of $12.59 by 550,000 pairs (200,000 pairs of New Balance shoes and 350,000 pairs of Henkee shoes), yielding the sum of $6,924,500.00.

## CONCLUSIONS

### I.     Jurisdiction

In an arbitration arising out of a transaction in international commerce, jurisdictional issues are resolved in accordance with international law, the New York Convention For the Recognition and Enforcement of Foreign Arbitral Awards. *Intergen N.V. v. Grina*, 344 F.3d 134, 149 (1st. Cir. 2003). International law recognizes that a

non-signatory to an arbitration agreement who, or which, is an alter ego of a signatory,

can be bound by it and required to submit to an arbitration demand by the other signatory.

*Id.*; *See generally,* Lamm and Aqua, *Defining the Party – Who Is A Proper Party In An*

*International Arbitration Before the American Arbitration Association and Other*

*International Institutions*, 34 Geo. Wash. Int'l L. Rev. 711 (2003). The same principle

would hold if jurisdiction were governed by Massachusetts law. *See, e.g., Ross v. Health*

*and Retirement Properties Trust*, 46 Mass.App.Ct. 82, 703 N.E.2d 734 (Mass.App.Ct.,

1998); *Keystone Shipping Co. v. New England Power Co.*, 1995 WL 1146893

(Mass.Super., 1995). Applying this principle to the facts of this case, I conclude that both

Yuntex and Mr. Chang are bound by the arbitration clauses contained in the License and

Distribution Agreements.

## II.    Merits

### 1.    Arbitrable claims and governing law

Although New Balance asserted a number of causes of action in its original

demand for arbitration, by the time of the hearing it had boiled its claims down to two:

breach of contract and trademark counterfeiting and infringement. While the trademark

claims are arbitrable to the extent they overlap with breach of contract claims, as separate

and independent claims they are beyond the scope of the parties' two arbitration

agreements.

The agreements encompass "any and all disputes related to or stemming from" the

License and Distribution Agreements. Although these arbitration agreements are broad,

they do not include New Balance's claims based on the US and Massachusetts trademark

protection laws that are not dependent on the existence of any agreement between the

14

parties. In other words, if the Respondents committed the alleged counterfeiting and infringement acts, they would be liable under those laws regardless of whether they ever had a contract with the Claimant. Therefore, the trademark law-based claims are not "disputes related to or stemming from" the License or Distribution Agreements.

Furthermore, I do not agree with New Balance's assumption that the US and Massachusetts trademark protection laws apply here. The License and Distribution Agreements each contains a choice of law clause providing that the "Agreement shall be deemed to have been entered into in the Commonwealth of Massachusetts, USA and shall be governed by and construed in accordance with the laws of the Commonwealth." This language cannot be read as showing that it was within the shared contemplation of the parties that the business activities they had agreed to conduct in China would be subject not only to Massachusetts contract law but also to the full panoply of federal and state laws that apply to parties doing business in Massachusetts. Therefore, in determining the merits of New Balance's claims, I have applied only Massachusetts contract law.

### 2.    Liability

As an initial matter, under Massachusetts law governing the liability of a non-party to a contract for breach of contractual obligations, I conclude that the relationship between Yuntex and Haikou, and between Mr. Chang and both companies, was such as to render both Yuntex and Mr. Chang liable for any breach of the License and Distribution Agreements. My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 (1968) (piercing the veil between closely identified corporations); Pepsi-Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc., 754 F.2d 10, 15-15 (1st. Cir.

15

1985)(applying Massachusetts law to pierce the veil between individual shareholders and corporations).

I conclude that Yuntex's retention and use of New Balance property after the termination of the License and Distribution Agreements constitute a continuing violation of §§10(c) and (e) of the License Agreement and §§1V.4(a) and XIV.3 of the Distribution Agreement, which require that following termination, all production, advertising, financial, technical, and marketing materials must immediately be returned to New Balance.

I further conclude that Yuntex's and Mr. Chung's sale after April 30, 2000 of 200,000 pairs of shoes made in 1999 for New Balance and bearing its trademarks constituted a violation of §§ 10(c) and (e) of the License Agreement and §XIV.3 of the Distribution Agreement, which in clear and unambiguous terms obligated Yuntex and Mr. Chang to refrain from making any use of New Balance trademarks upon termination. However, because I do not find the Henkee trademark confusingly similar to New Balance's, the manufacture and sale of Henkee shoes did not violate the anti-infringement provisions of § 5(c) of the License Agreement.

On the other hand, the manufacture and distribution of Henkee shoes in 2000 did violate the non-competition clauses in both Agreements, § 5(g)(i) and § VII, respectively, pursuant to whose clear terms Yuntex and Mr. Chang were to refrain for one year following termination from manufacturing, distributing, selling, or otherwise handling in China any products similar to New Balances' products or which can be put to identical or similar uses. Under Massachusetts law, these non-competition agreements are reasonable

in geographic scope and duration and, therefore, enforceable. *See, e.g., Boulanger v. Dunkin Donuts Inc.*, 442 Mass. 635 (2004).

### 3.   **Remedies**

Massachusetts law permits both specific performance and damages to be granted as remedies in a contract action. *See, e.g., Lima v. Lima*, 30 Mass. App. Ct. 479 (1991); *Singarella v. Boston*, 342 Mass. 385 (1961). In this case, I conclude that specific performance is warranted with respect to the Respondents' retention and use of New Balance property and the final award will include an order to that effect.

With respect to damages, although ordinarily the purpose of damages for breach of contract is to compensate the plaintiff for any loss sustained as a proximate result of the defendant's breach, Massachusetts contract law does recognize that under some circumstances, such as breach of an agreement to cease using a license to intellectual property, the appropriate remedy is to award the plaintiff the profits of the wrongdoer. *Eno v. Prime Mfg. Co.*, 314 Mass. 686 (1943). *See also*, Restatement (Second) on Contracts; § 371(b); Dobbs, Handbook on the Law of Remedies, § 12.1, p.791-792 (1973). I conclude that this essentially restitutionary measure of damages is clearly warranted here. Therefore, the final award will award New Balance damages against Yuntex and Mr. Chang, jointly and severally, in the principal sum of $ 6,924,500.00.

In addition, the final award will include prejudgment interest in accordance with a Massachusetts statute governing contract actions, M.G.L. Ch. 231, § 6C, which provides for simple interest at 12% per year from the date of the breach. Because the Respondents' improper withholding of discovery has made precise determination of the dates of their breaches, and the flow of profits therefrom, impossible, I estimate the date

17

of the breach with respect to New Balance shoes to be December 31, 2001 and with respect to Henkee shoes to be December 31, 2000, and will calculate interest accordingly.

New Balance has taken the position that it is also entitled to attorney's fees and costs. With respect to attorney's fees, New Balance appears to rely solely on U.S. trademark law, perhaps out of recognition that Massachusetts law allows fee shifting from the winner to the loser only pursuant to specific statutory authorization and there is no such authorization for ordinary contract actions. *Office One, Inc. v. Lopez*, 473 Mass. 113 (2002). Since I have ruled that US trademark law is inapplicable here, I conclude that New Balance may not recover its attorney's fees.

This leaves the matter of arbitration costs and how they should be allocated, which shall be decided in the final award, after the parties have had an opportunity to present their positions.

### Procedural Order

The parties shall submit briefs stating their positions on the allocation of arbitration costs by November 22, 2004.

Arbitrator 

Natasha C. Lisman

DATED:  November 10, 2004

#356116

18

**William Chang**

| | |
|---|---|
| **From:** | Natasha C. Lisman [lisman@srbc.com] |
| **Sent:** | Friday, September 12, 2003 2:35 PM |
| **To:** | William Chang |
| **Subject:** | Case No. 50 T 133 00057 03 |

Amended version

**IN THE MATTER BEFORE**
**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**OF THE AMERICAN ARBITRATION ASSOCIATION**

**NEW BALANCE ATHLETIC SHOE, INC.,**            **Case No. 50 T 133 00057 03**
**Claimant**

**vs.**

**YUNTEX ENTERPRISE (HK) LIMITED,**
**a Hong Kong entity; and HORACE CHANG,**
**an individual,**
**Respondents**

**FIRST PARTIAL AWARD**

**and**

**SECOND PROCEDURAL ORDER**

**Introduction**

In accordance with my Procedural Order of July 31, 2003, both parties have submitted statements setting forth their positions regarding the Respondents' jurisdictional objection to this proceeding on the ground that they are not signatories to the two agreements upon which the Claimant predicates its claims and demand for arbitration, the Distribution Agreement and the License Agreement ("the Agreements").

The Claimant, New Balance Athletic Shoe, Inc. ("New Balance") has submitted a brief, a supporting affidavit of its Vice President for International Sales, Edward John Haddad, Exhibits A through T thereto, and copies of legal authorities. The Respondents, Yuntex Enterprise (HK) Limited ("Yuntex") and Horace Chang ("Mr. Chang"), submitted, in electronic form, a letter over the

**NB3**

printed name of Wang Rong, Attorney-at-Law with Shenda Partners, but bearing no signature or letterhead.[1]  This letter was not accompanied by any supporting evidence or legal authorities.

For the reasons set forth below, applying the governing principles to the evidence in the record and reasonable inferences therefrom, I conclude that Yuntex is bound by the arbitration clauses of the Agreements and reject its jurisdictional objection. As to Mr. Chang, however, I reserve decision until the completion of discovery.

### Governing Principles

Like other aspects of arbitral disputes, the existence of arbitral jurisdiction over non-signatories to an arbitration agreement must be decided in "accord with the national law giving rise to the claim." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985). Here, each of the Agreements provides that it is to be deemed to have been made in, and is to be governed by and construed in accordance with, the laws of the Commonwealth of Massachusetts, U.S.A. With respect to cross-border transactions such as those here, the laws of Massachusetts, of course, include the Federal Arbitration Act, which in turn subsumes the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

Yuntex and Mr. Chang assert that their separate legal identities from the signatory to the Agreements, Haikou Johaco Enterprise Ltd. ("Haiku"), in and of itself precludes arbitral jurisdiction over them. This assertion overlooks the well established principle in the above-mentioned bodies of law that under certain circumstances, a non-signatory to a contract may properly be designated a party to an arbitration under the contract's arbitration clause. Recognized theories for binding a non-signatory to an agreement and its arbitration provisions include the piercing of the corporate veil and alter ego; succession to the interests of the signatory; assumption of the signatory's rights and obligations; and estoppel. See generally, Lamm and Aqua, *Defining the Party – Who Is A Proper Party In An International Arbitration Before the American Arbitration Association and Other International Institutions*, 34 Geo. Wash. Int'l L. Rev. 711 (2003). As to Massachusetts laws, see, e.g., *Ross v. Health and Retirement Properties Trust*, 46 Mass.App.Ct. 82, 703 N.E.2d 734 (Mass.App.Ct., 1998); *Keystone Shipping Co. v. New England Power Co.*, 1995 WL 1146893 (Mass.Super., 1995).

## The Facts

In making my factual findings, I considered only those averments in Mr. Haddad's Affidavit that identify and authenticate the documents attached as Exhibits thereto, or report actual events or statements of the corporate Respondent's executives or employees and/or of the individual Respondent. I disregarded the many subjective observations, conclusory characterizations and argumentative assertions included in Mr. Haddad's Affidavit, which do not constitute facts and are largely duplicative of the arguments that are, more appropriately, set forth in Claimant's legal brief.

My primary reliance on the documentary evidence obviates the concern expressed in Wang Rong's letter about Mr. Haddad's bias as an executive employee of New Balance.[2] I did, however, attach significance to the fact that the Respondents had the opportunity, but failed, to proffer evidence casting doubt on the authenticity or reliability of any of the Exhibits submitted by New Balance. I infer from this omission that the Respondents concede the authenticity and accuracy of these documents.

Based on these documents and other objective evidence, I find as follows:

1.      Yuntex is merely the new name that Johaco adopted as of October 31, 1997. Therefore, Yuntex is simply the continuation of the same entity under a new name and I shall refer to this entity as "Johaco/Yuntex."

2.      Haiku was, at all material times, a separate entity in name and form only, but for all practical purposes was nothing more than a branch office of Johaco and, after the above-mentioned name change, a branch office of Yuntex.

3.      To the extent that Haiku retained any legal identity after October 31, 1997, Yuntex, on its own initiative and with the assent of New Balance, assumed all of Haiku's rights and obligations under the Agreements and held itself out in the China market as New Balance's certified "China Authorized Sole Agent."

4.      There is significant evidence indicating that Horace Chang has at all material times been the control person of Johaco/Yuntex and has regarded and treated it as his sole proprietorship. However, I do not find the evidence sufficient to support a definitive finding on the relationship between Mr. Chang and Johaco/Yuntex at this time.

### Conclusions

Applying the above-discussed governing principles to the facts, I conclude that Johaco was at all material times an alter ego of Haiku. Under its new name, Yuntex , at the practical level, it continued to be Haiku's alter ego and at the formal level, it assumed and succeeded to the interests and obligations of Haiku under the Agreements.

However, under the exacting Massachusetts standard for piercing the corporate veil in order to impose serious legal consequences on individual shareholders, officers, and directors, the evidence is insufficient to permit a finding as to whether or not Johaco/Yuntex is an alter ego of Mr. Chang. For example, it is not entirely clear what company Mr. Chang characterized in Exhibit T as his "own company" and in what form he invested personal capital in the development of a market for New Balance shoes in China.[3] In addition, there is no evidence as to who has held equity in Johaco/Yuntex, its observance of corporate formalities under the applicable legal requirements, and its internal decision-making, financial, and accounting systems and practices.

I recognize that such evidence is largely in the Respondents' control and, therefore, reserve the decision on jurisdiction as to Mr. Chang until the completion of discovery.[4]

### FIRST PARTIAL AWARD

Yuntex's jurisdictional objection is hereby rejected. Action on Mr. Chang's jurisdictional objection is reserved until the conclusion of discovery.

### SECOND PROCEDURAL ORDER

The parties are hereby ordered to contact the ICDR Case Manager, Mr. William Chang, on or before September 22, 2003 and provide him with three possible dates during the first two weeks of October, 2003 for a new Preliminary Hearing to consider the previously tabled scheduling and preliminary matters, including, without limitation, the scheduling of discovery. In the meantime, however, the parties are free to serve document requests on each other.

Arbitrator,

SEP. 12. 2003 4 5:10PM BEFORE                                    NO. 0866    P. 7/7
                                                                            Page 5 of 5

---

Natasha C. Lisman, F.C.I. Arb.

September 12, 2003

#337413

---

[1]   This letter was transmitted as an attachment to an e-mail from johnnywu@ywntex.com.hk and the ICDR Case
Manager has confirmed that Wang Rong is the Respondents' counsel. Mr. Wu submitted Wang Rong's letter a week late,
without having sought an extension of time or offering any explanation. Under these circumstances, it would be within my
discretion to exclude the letter from consideration but, in view of the importance of the jurisdictional issue, I have not so
excluded it. I must, however, caution the Respondents to avoid unexcused delays in the future.

[2]   I should note, however, that Massachusetts law does not prohibit a person from testifying even on his own behalf,
much less on behalf of his employer.

[3]   Infusing additional capital into a company in return for additional equity or debt instruments, for instance, does not
erase boundaries between the individual and the entity.

[4]   I must stress to the Respondents that failure to respond to discovery requests or assertion of frivolous objections may
constitute fair basis for adverse inferences on the merits and/or estoppel to deny the truth of certain allegations.

---

This message is intended only for the designated recipient(s).
It may contain confidential and/or proprietary information and
may be subject to the attorney-client privilege or other confidentiality
protections. If you are not a designated recipient, you may not
review, copy or distribute this message. If you received this
transmission in error, please notify the sender by telephone
(617.227.3030) or by reply e-mail and delete this message.